## S. A. BERRIE v. STATE.

No. A-8567.   Feb. 2, 1934.
Rehearing Denied Feb. 27, 1934.
(29 Pac. [2d] 979.)

M. D. Hartsell and Grover P. Watkins, for plaintiff in error.

J. Berry King, Atty. Gen., and Smith C. Matson, Asst. Atty. Gen., for the State.

EDWARDS, P. J.   Plaintiff in error, hereinafter called defendant, was convicted in the district court of Muskogee county of murder and his punishment fixed at imprisonment for life.

Defendant contends the evidence is insufficient to sustain the judgment; that neither the proof of death by poison or that defendant administered any poison to deceased is shown. The case rests on circumstantial evidence. Briefly stated, the facts are about as follows:

Defendant was a minister of many years' standing; he was charged with the murder of his wife by administering poison. He was about 51 years of age, and had been married to deceased about 29 years, and the couple had a grown and married son. The deceased was about the same age as defendant, and was undergoing a change of life. She was subject to headaches, and had complained of kidney trouble. She was in the habit of taking aspirin compound in capsules and sometimes spirits of niter. On the day preceding her death she went to Sunday school, although complaining of headache. On returning, she drank a cup of coffee but ate no dinner. Soon after she took a capsule from the aspirin compound box, and about 1:30, with a lady friend, went to attend a lecture at a church. During this lecture she became ill and was taken to her home. She began to have convulsions, which continued at intervals for about 30 hours, until her death. Dr. Rafter was called, made a simple examination, and gave her a hypodermic. Dr. McAlister was next called, gave her a hypodermic, and ordered her sent to the hospital. Dr. Osgood, a homeopathic physician, was then called and also gave a hypodermic, and later prescribed passi-kola to be given every two hours. She died the next afternoon. Some time prior to his wife's death defendant had a young woman, Ida Bess Bright, then 17 years of age, 18 at the time of the trial, then attending high school, doing work as his secretary and spending a considerable portion of her time in his home. He became infatuated with her, had written her a number of amorous poems, some of them extremely suggestive. At one time deceased had objected to her presence in the home.

This young woman was agreeable to his advances, he had met her at different places in Muskogee, and for some months before the death they had been having sexual in-

tercourse, meeting at cafes, hotels, and at "Mary's Place"; defendant in some instances renting rooms for this purpose under an assumed name. Also defendant and the young woman had discussed his procuring a divorce and their getting married. Immediately after the funeral he was with the Bright woman, playful, laughing, and happy. Fifty-seven days after the death they were married. Suspicion having been aroused at the circumstances under which the wife died, her body was exhumed and a post mortem made and strychnine found. Soon defendant was called in and was interviewed by the county attorney and the chief of police and made contradictory statements. He later admitted he had made false statements. After a preliminary examination, he was confined in the county jail, and while there sent to his residence for a Bible; this was brought to him and received by the head jailor, who testified he examined it carefully, shook the leaves to see that nothing was concealed in it, but that there was a blank sheet of yellow paper in it. A day or two later defendant produced an identical appearing sheet of yellow paper on which purported to be a suicide note written by deceased, stating in substance she was tired of life, that it was not worth the effort. "Good Bye Forever." This was produced by defendant at a habeas corpus hearing as a showing the wife had committed suicide. It was conclusively proven that this note was not in the handwriting of deceased. As refuting the idea of suicide several times just prior to her death, deceased said in substance she could not understand what was the matter with her; she had never been so affected before.

The theory of the state was that defendant had become tired of his wife and had conceived the plan of poisoning her that he might marry the young woman; that

a capsule with some form of strychnine was substituted for the aspirin compound capsule which deceased was in the habit of taking, and that she did in fact take such poison capsule, which caused her death. The theory of defendant is that death was due to natural causes, probably uraemic poisoning. The state, in support of its theory, as is above stated, offered testimony of the relations between defendant and Ida Bess Bright, his poems and statements to show a wish to be rid of his wife, his conduct in relation to the purported suicide note as evidence of a sense of guilt, his willingness to present false testimony to explain the death of his wife. Further evidence of the wife, symptoms just before her death as proof that she died from strychnine poisoning; that she was apprehensive, thrown into convulsions by the least noise, the least touch, as by attempting to take off her underclothing; the creak of a stair, the whistling of a train, the touch of her grandchild; that she was conscious during and between these convulsions and relaxed and with pupils dilated.

On this point Dr. Rafter testified:

"* * * Q. Did you then, Doctor, at a later time, form an opinion as to what caused her illness and death? A. Yes, sir, I did. Q. What was that opinion? A. I thought it was strychnine. Q. Doctor, did you have occasion to and did you talk to me before the post mortem or before the body of Mrs. Fannie Berrie was taken up? A. You asked me in case we held an autopsy what we would find if we found anything and I said if we found poison it would be strychnine. * * *"

Dr. McAlister, when deceased was not taken to the hospital as he had directed, withdrew. His testimony is not very definite. He described the symptoms much as the other physicians and stated deceased had symp-

toms of strychnine poisoning; that from the symptoms he observed, and in the light of the autopsy findings, the chances were she died of strychnine poisoning. On cross-examination a hypothetical question was propounded covering the symptoms and actions of the deceased between the time she was taken to her home and the time of her death, and he answered:

"I think the description you have read would be typical of either tetanus or strychnine."

He was then asked:

"Q. Eliminating the question of tetanus, what would you say would be the cause of death? A. It is a text book picture of strychnine poison."

Taylor Rogers, a state chemist, testified he made the chemical test for poison and discovered strychnine in the vital organs.

Dr. Bailey, connected with the Wesley Hospital, Oklahoma City, testified he made a microscopic examination of the vital organs, thus:

"Q. State whether or not, Doctor, your findings were in conformity with the findings you would expect to make or the symptoms you would expect to find upon the examination of the organs of a body that had been administered strychnine? A. Yes sir, they were. The findings are of the nature and kind and degree that could be found in strychnine poisoning cases. Q. Were your findings in conformity with uraemic poisoning? A. No, sir."

Being further questioned, he testified in substance the symptoms following strychnine poisoning coincided with all the symptoms manifested by deceased just before death, and that the time of death after strychnine poisoning varied from a few minutes to as long as thirty or forty hours; he then stated he found no indications of uraemic

poisoning, and that the administering of hypodermics would delay the action of strychnine.

Wolsey, police chief, testified that before filing of charges defendant was brought to his office with the Bright woman, his then wife, and informed the body of his former wife had been taken up and strychnine found in the body; that her death was under investigation; that defendant did not have to make any statement whatever. He was then questioned apart from his wife, and said his relationship with Ida Bess Bright before the death of his wife was merely with regard to church matters. He denied having been with her at any time at De Luxe Cafe or other places mentioned and any improper conduct. After the wife had been questioned, witness again talked with defendant, who then admitted meeting the Bright woman at De Luxe Cafe and at various other places, as the Pan American Cafe and at "Mary's Place," and that he had intercourse with her a number of times from about Christmas to the death of his former wife, loved her better than any woman he had ever seen; that he had discussed with her his getting a divorce. He also admitted having written the verses and other writings in possession of police. Said they had been written and delivered prior to the death of his wife. Defendant at first said parts had been cut from some of them, but denied he did this, but later said he had and had burned these parts and had destroyed other writings altogether. The trend of these is shown by the following excerpts from different items:

"* * * My arms are hungry to hold you to my heart in love's embrace.
I love you so much, my darling,
For giving your love to me;
You satisfy every longing
What more to me could you be? * * *"

"* * * Your head laid upon my breast
Content in love to rest.* * *"

"* * * A thousand times each nite
I see you in my dreams. * * *"

"* * * For I don't care what the world may say
I'll forget the gain, the loss and the pain
That tortures my pulsing breast .
Sweetheart, I love you best."

"You live in this heart of mine,
As long as the world is standing * * *
Without you I'd care not to live. * * *"

"* * * I never knew until your dear arms entwining * * *
And I never want to be free
I know I've found the only girlie for me—
            * * *
So you will be mine some day forever.
Sweetheart I'm love bound
All my heart I've given thee
Just longing and waiting till I am set free,
Then out of lifes ocean together we'll ride,
Basking in loves sunshine happy and free
Through life we'll journey whatever betide,
            * * *"

In one he asks "Oh, why can't we be free." In another, "Some day sweetheart twill not be long, that we shall be as one." And so on, and so ad nauseam.

There is evidence of other circumstances tending to sustain the state's theory. Thus it is shown that some time after the death defendant and the Bright woman were in the yard; she took from a trash container what purported to be a small box or bottle, which he instantly took from her hand. Just before death a ring was removed from the finger of deceased and later given by defendant to the Bright woman. In a habeas corpus hearing defendant produced the false suicide note above referred to, and in addition testified his deceased wife had threatened to take strychnine as showing a knowledge that death was due to strychnine poisoning; that he told witness Wolsey that, between the time of the death of his wife and his marriage to the Bright woman, she mentioned to him it was rumored his wife had died of poison, and he immediately thereafter destroyed some of the notes and poems.

Neither the Bright woman nor defendant testified in this trial, although several defense witnesses were called, among them Dr. Osgood, who attended deceased until her death. He signed a death certificate reporting the death due to nephritis and endocarditis. He prescribed passi-kola, which is composed of ignatia, 1/10 drop of ignatia to a teaspoonful of passi-kola; that ignatia contains strychnine, 1/330 of a grain to the teaspoonful of passi-kola; and that a fatal dose of strychnine is ½ grain. On cross-examination he said that there was 9/1000 of a grain of strychnine to an ounce of passi-kola.

R. M. Isham, a chemist, testified for defendant that the usual dose of strychnine is 1½ grains, a minimum dose ½ grain, and in substance said he had discussed with Dr. Osgood the medicine prescribed, and that passi-kola contained 14/100 milligrams per ounce, and that such quantity was sufficient to satisfy the test to show the presence of strychnine; that he examined the urine analysis of deceased, and that it showed death due to uraemic poisoning; that he was not able to tell how much strychnine had been absorbed or assimilated in the body; that in a large dose 9/10 would be so used—less in a small dose.

Upon the whole case, the state contends the evidence fully sustains the judgment; that the state has shown a desire on the part of defendant to be rid of his wife, a guilty love as a motive for the crime, has shown a knowledge by defendant of the habit of his wife to take harmless capsules and opportunity to substitute poison; that death was not due to natural causes nor to suicide, but to strychnine poisoning; that defendant knew this to be the cause of death, and attempted to concoct false testimony to explain death from strychnine poisoning; that, since an unlawful homicide by poison must in practically

all cases be proven by circumstantial evidence, the circumstances proven are sufficient to require the submission of the case to the jury; that they exclude every reasonable hypothesis other than the guilt of defendant.

Cases on criminal law recognize that illicit love furnishes a motive for a great many murders and other crimes. Some cases state it is more fruitful than any other single cause. Miller v. State, 9 Okla. Cr. 255, 131 Pac. 717, 723, L. R. A. 1915A, 1088; Brown v. State, 9 Okla. Cr. 382, 132 Pac. 359, 372.

In the instant case the circumstances proven form an almost complete setting for a crime of this kind. The testimony that deceased died from strychnine appears conclusive. Suicide as a cause of death is eliminated. Then, with proof of this powerful motive of defendant to be rid of his wife and to have the Bright woman without hindrance or disturbing his church affiliations, must have led the jury to the irresistible conclusion of defendant's guilt.

The only other assignment requiring discussion is that the county attorney was guilty of misconduct in the trial and that the trial court likewise committed error in the conduct of the trial. The county attorney conducted a vigorous prosecution, and in his zeal overstepped the proper functions of his office. In the opening statement to the jury he began the reading of certain writings of the defendant as a part of his statement. Any prosecuting officer should know better than that. Upon objection being made, the court promptly sustained it. At other times his questions were leading and suggestive, but objections were generally sustained. The court was hardly peremptory enough in his rulings and control of the county attorney. Counsel for defendant made a spirited

and able defense, interposed many objections and took many exceptions. In some instances these were argumentative, and the court in one instance threatened to fine him. This was improper, and is to be condemned. While in the heat of a closely contested trial rather difficult questions which severely tax the patience of the court sometimes arise, yet a trial court should exercise more judicial poise and temperament.

Several other assignments are presented and discussed to some extent in the briefs. We have examined all of these, none have been overlooked, but we think it unnecessary to analyze or refer to them further. They present no material error prejudicial to defendant.

From a careful and earnest consideration of the entire case, we are satisfied the errors mentioned did not in any wise affect the verdict, and that a reversal on account of these errors would be wholly unjustified.

The case is affirmed.

DAVENPORT, J., concurs.

CHAPPELL, J. (dissenting). I cannot agree with the majority opinion in this case, because to sustain a conviction the state must prove: First, that Mrs. Berrie died of strychnine poisoning; second, that defendant administered the poison himself or procured it to be done by another.

To sustain the state's contention that Mrs. Berrie died of strychnine poisoning, it called Dr. W. W. Bailey, who testified on direct examination that he found a small amount of strychnine in the liver, spleen, stomach, and contents, but not sufficient to measure the quantity, and detailed the symptoms of strychnine poisoning. As to the cause of Mrs. Berrie's death the doctor was asked on cross-examination:

"Q. Doctor, from your experience as a physician, you do not attempt to state to the jury or give the jury any opinion as to what was the cause of the death of deceased, based upon your examination of the portion of the body that you examined and upon what your examination disclosed? A. No, sir."

The state also called Taylor Rogers, state chemist, employed by the state health department, who testified to the symptoms of strychnine poisoning, and that he made tests of the liver, spleen, stomach, and contents of Mrs. Berrie and found traces of strychnine in those organs; that he made an attempt to determine the quantity, but the material he was using was too small and he could not. Later, on cross-examination, he was asked this question:

"Q. Now, you don't pretend to know, as a chemist, the cause of the death of Fannie L. Berrie, do you? A. No, sir."

The state also called Dr. L. S. McAlister, who testified he was called to treat Mrs. Berrie shortly after she was taken sick, and that, after examining her, he remained there a short time, but formed no definite diagnosis of the cause of her sickness; that he recommended her to be taken to a hospital, where he might have better opportunity to make a diagnosis; that, when this was not done, he withdrew from the case. He was asked this question by the county attorney:

"Q. Doctor, from the observation that you had and the history you have of the case, have you formed any opinion as to the cause of the death of Fannie Berrie? A. The history I have now? Q. Yes. A. Well, I formed that in the light of the autopsy findings and the symptoms I gave you, the chances are she died of strychnine poisoning."

Later the witness said:

"A. Without the autopsy, I wouldn't feel justified in making a diagnosis of strychnine poisoning."

On cross-examination, the witness said:

"A. Yes, I think I told them she might have toxin infection, which is, when interpreted in plain English, a type of hysteria. Q. You would not, without these reports, say, as an expert, or as a physician, that she died of strychnine poisoning, in your opinion, would you? A. Taking into consideration my limited experience, no, sir."

The state next called Dr. James G. Rafter, who testified he was called to see Mrs. Berrie shortly after she was taken sick, and detailed the symptoms of strychnine poisoning. He was asked the following question:

"Q. Did you then, doctor, or at a later time, form an opinion as to what caused her illness and death? A. I thought it was strychnine."

This doctor also testified that 4½ per cent. of albumen in the urine was generally indicative of a very bad condition of the kidneys, and would probably indicate uraemic poisoning.

Several witnesses detailed the symptoms exhibited by Mrs. Berrie from the time she was taken sick until she died. Upon these symptoms the state predicated its hypothetical question to its experts, and from which doctors testified as above set out.

This is the essence of all the evidence of the state tending to prove that Mrs. Berrie died of strychnine poisoning.

To rebut this evidence, the defendant called Dr. W. W. Osgood, who testified he treated Mrs. Berrie about 8 o'clock on the evening of March 20th; that he took a sample of her urine and had it tested at a laboratory in

Muskogee; that this test showed 4½ per cent. albumen and indicated inflammation of the kidneys; that he prescribed passi-kola; that passi-kola contains strychnine; that he directed this medicine to be given to Mrs. Berrie every two hours; that the patient had several convulsions which, taken with the urine analysis, indicated uraemic poisoning; that he saw her four or five times; that she responded to his treatment, and he thought she would recover; that he issued a death certificate showing the cause of her death to be nephritis and endocarditis.

On cross-examination, Dr. Osgood stated that on more study of the case he arrived at the conclusion the cause of her death was uraemic poisoning.

Defendant also called Robert M. Isham, a chemist, who testified the minimum lethal dose of strychnine is one-half grain; that under the fading purple test for strychnine the amount required is 1/27027 of a grain; that 13,513 positive tests could be obtained for the fading purple test with the amount of strychnine necessary to cause death; that in applying the taste test the amount necessary to give the test is 1/13513 per cent.; that the test could be applied 67,000 times for one-half grain of strychnine; that one ounce of passi-kola, the medicine claimed to have been given Mrs. Berrie, contained 14/100 milligram of strychnine; that you could obtain the fading purple test 56 times from one ounce; that you could apply the taste test to the amount of strychnine contained in one ounce of passi-kola 28 times; that a chemist looks for two outstanding things: First, whether strychnine is present; second, the quantity, and that this examination would be fruitless unless you could obtain a quantity test; that the Taylor Laboratory reports indicated no quantity test was made for strychnine; that the Terrell laboratory test of

Mrs. Berrie's urine showed she had nephritis; that the condition shown by the urine analysis would produce convulsions.

In rebuttal the case offered no other evidence to sustain the charge that Mrs. Berrie died of strychnine poisoning.

To sustain the charge that defendant administered the strychnine to deceased, the state offered evidence that he was infatuated with Ida Bess Bright, who was secretary of the church and very often in his home; that at one time his wife asked him not to have the girl about the church because of what the neighbors might say; that defendant wrote her a number of gushing poems, expressing his sentiment for her and that he could not be happy without her and they would be together before long; that defendant told certain officers he loved the Bright woman better than his life; that he met her frequently at restaurants and other places, and they also visited a rooming house and had sexual intercourse; that on the day of the funeral defendant handed an envelope with some papers in it to the Bright woman, which the witness thought contained insurance papers, but later the couty attorney admitted there was no insurance in the case; that the Bright woman was at the home during the sickness and death of Mrs. Berrie, accompanied defendant and the family to the funeral, and was frequently with him after the funeral; that he married the Bright woman 59 days after the death of his wife; that a few days after their marriagé defendant and his wife were seen in the back yard burning trash; that she picked up what looked like a small box or bottle, and that he took it out of her hand and tossed it into the trash burner; that after his arrest he at first denied any illicit relations with the Bright woman,

but later admitted the relations between himself and her as above set forth; that no tombstone had been erected over the body of Mrs. Berrie; that defendant purchased a new automobile shortly after his wife's death; that at the trial the Bright woman was wearing a ring taken from Mrs. Berrie's finger while she was sick; that defendant took the witness stand in habeas corpus proceedings for bail, but made no mention of any threat of suicide or any belief that his wife might have committed suicide; that later defendant again applied for a writ of habeas corpus, and at that time produced a suicide note which he claimed to have found in his wife's Bible. The state showed by J. C. Sherman, a handwriting expert, and other witnesses that this note was not in the handwriting of Mrs. Berrie, but made no effort to show that defendant was the author of the note.

The state offered no evidence that defendant ever purchased or possessed any strychnine, or that any strychnine was found about the house or any container or evidence of strychnine being about the house, nor that he had anything to do with the possession or taking of the capsule which Mrs. Berrie took after dinner and before she was stricken at church.

To rebut this evidence that defendant had administered the poison, he produced Iliff Berrie, a son, Ruth Berrie, the son's wife, and others, who testified the suicide note was in the handwriting of Mrs. Berrie. Inmates of the jail testified that, shortly after the Bible was taken to defendant's cell in the county jail, certain papers fell out of the book on to the floor, and that later defendant produced this note as being among those papers.

Ruth Berrie, the daughter-in-law, testified she removed the rings from her mother's hands so she could rub

them and restore circulation, and dropped the rings in defendant's pocket; that the ring worn by the Bright woman at the trial was a gold band ring which her mother did not wear because it was too small for her; that deceased complained of headache and kidney trouble; that she would purchase aspirin compound capsules and keep them in her handbag purse; that she had her purse with her at Sunday school that morning, took a capsule after drinking a cup of coffee at noon, and took the purse with her to the meeting at the First Christian Church; that the passi-kola left by Dr. Osgood was given to deceased according to directions; that charges had been preferred against defendant before the presbytery that he preached a doctrine contrary to the church, and a hearing set on these charges at Wagoner, before the presbytery; that deceased had been greatly worried over these charges, and said that she could not bear them—that it would kill her; that deceased was highly nervous and despondent; that she was going through the change of life, and had been having headaches and kidney trouble for a considerable time; that during her last illness she heard her say to defendant:

"Sweetheart, you are so good to me," and he said, "Am I not always," or something like that, and she said, "Yes, especially when I am sick"; that defendant seemed to be terribly worried and hurt over deceased's sickness; that later deceased said "They persecuted my husband and he is innocent and it is killing me, and I am ready to go if you promise you will help take care of little Dot"; that Dr. Rafter made no examination; that he seemed to be drinking, and she could smell liquor on his breath; that he made no diagnosis or statement as to what was the matter with deceased.

Iliff Berrie testified to the most cordial and affectionate relations between his father and mother, and cor-

roborated his wife as to who removed the rings from their mother's hands and what was done with them.

The minister who conducted deceased's funeral testified the papers handed by defendant to the Bright woman were the obituary and funeral notices for the newspapers.

Neither defendant nor the Bright woman took the witness stand.

When the state had rested its case, defendant demurred to the evidence and requested the court for an instructed verdict of not guilty, which request was denied.

In his motion for a new trial in the lower court and his petition in error in this court, defendant renews his complaint that the verdict of the jury and the judgment of the trial court thereon are contrary both to the law and the evidence.

The question for this court to determine from the evidence in this case is: Did the state, as it was required to do under the allegations of the information, prove beyond a reasonable doubt that Mrs. Berrie died of strychnine poisoning?

The evidence of the state as to the cause of Mrs. Berrie's death is so contradictory and unsatisfactory that it cannot reasonably be said she died of strychnine poisoning. In fact, the evidence of all the doctors who waited on her during her illness is either guesses or entirely contradictory.

On the second proposition, there is no competent evidence tending in any wise to show either that defendant administered the strychnine to deceased or procured it to be done.

The state proved defendant guilty of reprehensible conduct in his relations with Ida Bess Bright, and thus

established a motive for the crime. While proof of illicit intercourse with another woman, failure to erect a tombstone over the grave of his dead wife, the purchase of a new automobile shortly after her death, and marriage to the woman in the case 59 days after his wife's death are suspicious circumstances, they are not proof beyond a reasonable doubt that he killed his wife by the administration of strychnine.

This court in numerous cases has said:

"The facts and circumstances proved must not only be consistent with and point to the guilt of the defendant, but they must be inconsistent with his innocence." Sies v. State, 6 Okla. Cr. 142, 117 Pac. 504; Nash v. State, 8 Okla. Cr. 1, 126 Pac. 260; Davis v. State, 18 Okla. Cr. 112, 193 Pac. 745; De Bose v. State, 18 Okla. Cr. 549, 197 Pac. 176; Key v. State, 22 Okla. Cr. 284, 210 Pac. 1044; Hamilton v. State, 25 Okla. Cr. 233, 219 Pac. 951; Tomlinson v. State, 27 Okla. Cr. 429, 228 Pac. 608; England v. State, 29 Okla. Cr. 38, 231 Pac. 1087.

"Where the evidence is wholly circumstantial, and the facts and circumstances in evidence are of such a character as to fairly permit an inference consistent with innocence, it cannot be regarded as evidence sufficient to support a conviction." Brown v. State, 12 Okla. Cr. 343, 156 Pac. 1150; Robbins v. State, 12 Okla. Cr. 412, 157 Pac. 1027.

"Where the state relies wholly on circumstantial evidence to prove guilty knowledge, the circumstances relied upon, when considered together, must point clearly and conclusively to the guilt of defendant and exclude every reasonable hypothesis other than that of guilt." Davis v. State, 18 Okla. Cr. 112, 193 Pac. 745; Adams v. State, 38 Okla. Cr. 173, 259 Pac. 665.

As was said in Davis v. State, supra:

"The appellate court cannot safely permit a judgment of conviction to stand unreversed, where one material ele-

ment of the offense rests alone upon evidence which amounts merely to suppositions or suspicions of guilt."

In Freeman v. State, 52 Okla. Cr. 209, 4 Pac. (2d) 120, this court said:

"As a general rule, verdicts which have received the approval of the trial judge will not be disturbed when supported by evidence sufficient to make out the offense. However, when the evidence is all carefully considered and it appears that it is wholly wanting in respect to some essential element of the offense charged, the judgment will be reversed as insufficient to sustain the conviction."

In Richards v. State, 52 Okla. Cr. 436, 6 Pac. (2d) 449, this court said:

"Where the evidence tending to connect defendant with the crime charged is wanting in some necessary element and at best shows only a probability of guilt, this court will reverse the judgment."

In State v. Blydenburg, 135 Iowa, 264, 112 N. W. 634, 14 Ann. Cas. 443, that court said:

"Where one is charged with murder by the administration of a designated poison, the possession by accused of such poison at the time of the alleged offense is a necessary condition to support a conviction."

In the body of the opinion the court said:

"As appellant was charged with the commission of murder by the administration of arsenic, the possession by him of arsenic at the tme of the alleged offense was a necessary condition of his guilt. It was very important, therefore, for the state to trace, if possible, that particular poison to his hands. The only proof offered for which such effect is claimed was, * * * that appellant had on one or more occasions bought 'Rough on Rats'; last occasion being two months prior to the alleged murder. No part of this article so sold was produced or identified on the trial." But experts testified that Rough on Rats contained probably 50 per cent. of arsenic.

While this court has never gone that far, it has uniformly followed the rule in the cases heretofore cited where in effect it has held that to warrant a conviction on circumstantial evidence, each fact in the chain of circumstances necessary to prove guilt must be proven by competent evidence beyond a reasonable doubt, and all the facts necessary to prove guilt must be connected with each other and with the main fact, and all the circumstances, taken together, must be of a conclusive nature, producing a moral certainty that the crime charged was committed and that the accused committed it.

Measured by this standard, the evidence in this case is wholly insufficient to prove that defendant either administered the poison or procured it to be done.

Defendant also complains that the county attorney was guilty of prejudicial misconduct in his opening statement to the jury.

Examination of the record discloses that counsel attempted in his opening statement to justify the filing of murder charges against defendant. A few quotations will be sufficient to show the nature of these statements. To begin with he said: "One reason why I felt so much interest in this case is the fact that I know way back yonder at Sentinel, Oklahoma, there is an old woman 84 years of age that felt in her heart that this defendant was guilty of the crime of murder."

The court sustained defendant's objection to this statement, but this court in Green v. State, 39 Okla. Cr. 430, 266 Pac. 512, held that an argument calculated to sway the jury, and which is appealing to prejudice and passion and not based on the evidence, where properly excepted to, constitutes reversible error.

It also appears from the record that the county attorney sought to justify the prosecution by calling as witnesses at the opening of the trial the sisters and brother of defendant's deceased wife. None of these witnesses could testify to any fact material or competent in the case, and were called only for the purpose of testifying that their suspicions were aroused and they had demanded an investigation. The court permitted this kind of evidence to be introduced, over defendant's objection. It was not only unnecessary but highly improper for the county attorney to seek to justify the filing of the charge against defendant. It was absolutely immaterial and highly improper that an 84 year old woman believed in her heart that defendant was guilty of the murder of her daughter, and it was also highly improper and prejudicial that his deceased wife's sisters and brother had suspicions in connection with the case and had requested the county attorney to investigate it.

Defendant also complains that the county attorney was guilty of prejudicial misconduct in his argument to the jury. The county attorney said:

"Could this relationship continue, the relationship that was going on between them? Could that continue? Let me say that there is not a denial of it by a single witness in this case, and yonder sits his present wife who could have taken the witness stand and told us that it didn't exist if it didn't, but she didn't do it."

He also said:

"I see that in the original conversation with John Wolsey and John Wolsey's testimony in this case, that John Wolsey testified in detail as to the original statement of Dr. Berrie at the jail; that that testimony of John Wolsey does not show that the doctor there at the jail house in those original conversations ever denied to John

Wolsey at the time the original conversations were had, that he, the doctor, poisoned his wife."

Defendant's counsel objected to this statement, which was by the court overruled.

This line of argument was entirely improper. It was not incumbent upon defendant to deny at any time any statement made by him to any officer or other person in connection with the crime with which he was charged. The burden of proof was on the state to show that Mrs. Berrie died from strychnine poisoning and that defendant administered it. This line of argument could have been intended for no other purpose than to prejudice the minds of the jury against the defendant upon a matter not properly in issue.

Defendant next contends it was prejudicial error for the county attorney to ask the following questions:

When one of the state's witnesses testified to seeing the defendant and his wife in the back yard burning trash and to seeing the wife pick up a small brown box or bottle and defendant take it out of her hand, he asked the witness: "When he grabbed that out of her hand?" thereby implying something which the witness had not said.

He asked the state's witness, Ruth Berrie, this question:

"Q. I will ask you to state if at the time Mr. Wolsey and I talked to you at your home, before Dr. Berrie was arrested, if you did not state then that it was your opinion that Dr. Berrie poisoned Mrs. Berrie?"

Later in the trial, the county attorney asked her this question:

"Q. I will ask you to state whether or not before the grand jury, on the 8th day of August, you made this state-

ment, or this in substance, 'In my opinion, Dr. Berrie poisoned his wife?' "

An objection was made to the question, and the county attorney said:

"We are simply laying the ground for impeachment of the witness, Your Honor, that is all I am seeking to do. The Court: Proceed."

Thereupon the county attorney asked the following question:

"Q. Mrs. Berrie, I will ask you if that is not true, that on the 8th day of August, before the Muskogee county grand jury, in the presence of the twelve grand jurors and Mr. Babb and myself, didn't you say this, or this in substance, that Dr. Berrie poisoned his wife?"

This was objected to by defendant's counsel, and the court said: "I believe I will let her answer that."

These questions were also asked Iliff Berrie, defendant's son, who was permitted to answer over defendant's objections.

It nowhere appears in the record that the county attorney made any effort by any witness to show that this daughter-in-law of defendant had ever made any such statement, although the county attorney, Mr. Babb, and members of the grand jury could have been called for that purpose.

These questions were highly improper and prejudicial, and could have been asked for no other purpose than to destroy the effect of the testimony of the witnesses and prejudice the jury against them.

This court has held in a number of cases that the mere asking of incompetent questions by the county attorney, even where the court sustained an objection thereto, where such questions tended to degrade and belittle the defend-

ant, is ground for reversal. Watson v. State, 7 Okla. Cr. 590, 124 Pac. 1101; Freeman v. State, 20 Okla. Cr. 443, 203 Pac. 1052.

Complaint is also made that the county attorney was guilty of misconduct in asking Dr. Isham, a defense witness, this question:

"Q. And the estimate you gave would depend upon whether you were called as a witness for the state or the defense, wouldn't it, doctor?"

Dr. Isham had testified that Mrs. Berrie died of uraemic poisoning. He further testified that from one ounce of the passi-kola taken by Mrs. Berrie there was enough strychnine to have produced the positive reaction in the qualitative test made by the state's chemist, known as the blue-purple test. This question was asked by the county attorney to discredit the witness, without any cause whatever, and to prejudice him and defendant's cause before the jury.

Under section 2699, C. O. S. 1921, defendant's wife could not be used as a witness against him. If she could not be used as a witness against him, the fact of her absence from the witness stand could not be used as a circumstance against him, for that would still be using defendant's wife as a witness against him. Nor could the officer properly testify to anything defendant's wife said that tended to connect defendant with the crime.

In Stutsman v. Territory, 7 Okla. 490, 54 Pac. 707, 710, the Territorial Supreme Court said:

"The statute does not contemplate, nor will it permit, that a husband or wife shall, directly or indirectly, be coerced by others upon the witness stand to testify one against the other. * * * If the failure of the husband to call his wife as a witness in his behalf is to be construed as evidence against him, or even as a circumstance against

him, his privilege and option which the statute expressly accords to him, would be absolutely annulled, and he would be compelled in all cases to produce her, or run the hazard of being convicted on an implied confession or admission, or to make explanations for not offering her as a witness, which may result in breaking down or impairing the great principles which protect and involve the sacred privacy of domestic life."

Under this authority and others which might be cited, it was not necessary for defendant's wife to take the witness stand and deny statements which Wolsey testified she made, as the same was entirely prejudicial and wholly inadmissible.

The effect of these statements and argument was to get before the jury the idea that, since neither defendant nor his wife had taken the witness stand to deny statements Wolsey claimed were made to him by them, therefore they amounted to admissions of the facts. This also amounted to a comment upon the fact that defendant had not testified.

This court has repeatedly reversed cases where the misconduct and prejudicial statements of the county attorney were not so grave, uncalled for, and prejudicial as in the case at bar.

The county attorney is an able lawyer and a vigorous prosecutor, and, evidently believing the defendant to be guilty, he left nothing undone or said that could in any wise influence the jury in finding defendant guilty.

Assignments of error 7 to 13, inclusive, are all directed to the alleged misconduct of the trial judge, which prevented defendant from obtaining a fair trial.

The first instance has to do with the threat of the trial judge to send the defendant's counsel to jail. It appears from the record that defendant's counsel was examining

one of his witnesses; objection was made by the county attorney to certain questions, which objections were sustained by the court. Thereupon defendant's counsel dictated into the record what he expected to prove by the witness, to which the court said:

"Now, Mr. Hartsell, you asked a question and I sustained it and you come up here and dictate into the record an entirely different state of facts than what the question called for, and I ask you not to do that any more. Mr. Hartsell: We except to the remarks of the court. The Court: What you dictated into the record is not anything like your question just asked. Mr. Hartsell: That is what I am trying to do if I had half a chance. The Court: Mr. Hartsell, if you say anything like that again I will send you to jail. Mr. Hartsell: We except. The Court: I don't know what your purpose is in assuming that attitude, but it seems like you have some purpose. Mr. Hartsell: We except to the remarks of the court."

And a little further on, and during the examination of the same witness, the court said:

"I have known you, Mr. Hartsell, for 25 years, and you are as good a friend as I have, but if you don't conform to the rules of this court I am going to have you trade chairs with Mr. Watkins and have him conduct the case. Mr. Hartsell: We except to the remarks of the court. The Court: I know one thing, and I think any man or woman in the world that ever saw me on the bench would say that I try to do the right thing and try to be fair, and you haven't been fair with the court since the beginning of this trial. Mr. Hartsell: We except to the remarks of the court."

All of these threats to jail defendant's counsel and to take him out of the case were made in the presence and hearing of the jury.

This court has reversed several cases because the trial court threatened, in the presence of the jury, to jail de-

fendant's counsel. McSpadden v. State, 8 Okla. Cr. 489, 129 Pac. 72; Kelley v. State, 31 Okla. Cr. 51, 236 Pac. 915; Boyer v. State, 16 Okla. Cr. 388, 183 Pac. 620.

To properly present the questions involved in this case has required an unusually long dissenting opinion, but the writer has felt that it was justified because of the gravity of the case.

Under the majority opinion, the defendant must spend the remainder of his life in the penitentiary, unless he receives relief from the executive department of the state, notwithstanding the evidence is wholly insufficient to support the verdict of the jury and the case should have been reversed and dismissed for that reason; and, being convinced from an examination of the record that the jury undoubtedly returned their verdict of guilty because of the prejudicial misconduct of the county attorney and the trial judge, I have been compelled to disagree with my colleagues on the court and dissent from the majority opinion.