## SUE D. BRITTON v. STATE.

No. A-9232. July 9, 1937.
(70 Pac. 2d 828.)

Claude Nowlin, Leslie L. Connor, O. A. Cargill, and Gomer Smith, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Sam H. Lattimore, Asst. Atty. Gen., Lewis R. Morris, Co. Atty., and Walter Marlin, Asst. Co. Atty., for the State.

DAVENPORT, P. J. The plaintiff in error, hereinafter referred to as the defendant, was on the 20th day of June, 1935, by information filed in the district court of Oklahoma county, charged with the crime of murder by shooting to death C. J. Britton, her husband, in the city of Oklahoma City, Okla. Demurrer to the information was filed, overruled, and the defendant was tried for murder, convicted of manslaughter in the first degree, and sentenced to serve a term of ten years in the state penitentiary.

Motion for new trial was filed, considered, and overruled, and exceptions duly entered of record, and the defendant has appealed by petition in error with case-made attached.

The substance of the testimony presented by the state is that the defendant, Sue D. Britton, and C. J. Britton were husband and wife; prior to the defendant's marriage her maiden name was Newcomb; the home of the defendant and the deceased was at 2141 N. W. 27th street, Oklahoma City, Okla.

Bus Lynn, a witness testifying for the state, stated he was a clerk for Anderson, Incorporated, at 124 West Grand, Oklahoma City, Okla.; that the company dealt in sporting goods and loans; on May 20, 1935, he sold a pistol to a woman who gave her name as Mrs. C. J. Britton, and her home address as 2141 N. W. 27th street. State Exhibit 1 was identified as the pistol he sold Mrs. Britton

on May 20, 1935. The witness further stated he sold to Mrs. Britton ten cartridges of the caliber of the gun he sold her on that date.

W. W. Harbolt, a witness for the state, stated he was a police officer in Oklahoma City, and had been for two years; he was employed by the city on May 20, 1935, on a scout car; V. O. Webb was also working with him; they went to 2141 N. W. 27th street, on May 20, 1935, about 4:52 in the afternoon; when he reached No. 2141 N. W. 27th street, Mrs. Sue Britton was there. The witness identified the map showing the house and arrangement; the defendant was sitting in a chair in the living room, and "I saw a revolver on the floor in front of where defendant was sitting. Webb and I picked up a sack off the table and put the revolver in this sack; we picked the revolver up with a handkerchief. This pistol exhibited is the pistol I picked up from the floor near where the defendant was sitting. We called Clint Miers, our homicide man, and stayed there until he arrived. Clint Miers and Bill Eads came out together."

On cross-examination witness stated the defendant was sitting in a chair sobbing.

"On the way to town I noticed there were two or three little cuts on her arms; both her arms and wrists between the wrist and elbow were bleeding, just a little bit of blood was coming out of her arm. We did not do anything unkind to her, we treated her as nice as we could. The pistol identified was on the carpet near where she was sitting in a chair. Mr. Miers and Mr. Eads came out, and we stayed around there five or ten minutes and took Mrs. Britton down town. Our reason for taking the handkerchief to pick the gun up was for the purpose of preserving the fingerprints, if there were any on the gun."

The state maintains a Bertillion Department to take fingerprints if it so desires.

"After we put the gun in the sack we kept it there until Mr. Miers and Mr. Eads arrived. We had not broken the gun to see how many shells it had in it."

On redirect examination witness states:

"A few minutes after we arrived defendant asked me to call Mr. Nowlin, and to call Mrs. Cohen; I understood the Mr. Nowlin she wanted was Claud Nowlin."

Mamie Hansberry testified in behalf of the state, stating:

"My name is Mamie Hansberry; I am 37 years of age and married; Mr. and Mrs. Britton lived at 1132 Pennsylvania; I worked for them from September, 1932, until April, 1933, doing housework; they did not have any children; I remember when they moved from Pennsylvania, but I do not remember the date; when they were ready to move Mrs. Britton came for me and wanted me to help move and straighten up. From the time they moved out to 2141 West 27th street, I worked for them at different times; I was working for them on the 20th day of May, 1935; I don't know just how long I had been working prior to that time; their evening meal was usually served about 4 o'clock in the afternoon; Mr. and Mrs. Britton were at home on the morning of May 20, 1935, and ate their breakfast at home; Mr. Britton left home first that morning; Mrs. Britton left a short while after Mr. Britton left; each of them had an automobile. Mr. Britton came home about 30 minutes after Mrs. Britton came home; I did not see Mr. Britton when he came in, but I did see Mrs. Britton; Mrs. Britton did not say anything to me about what she bought while she was down town; when Mrs. Britton came home she went into the living room or bedroom like she usually did when she came home; they occupied the front bedroom next to the living room; Mr. Britton came home that afternoon after I had

dinner on the table; when I went to the window to see whether or not he was there he was in his car; I know Mr. Britton had been in the house because I heard him talking; the driveway of the Britton home is east of the house; there is a sidewalk in front and back; in the front you walk from the driveway to the porch in front of the house, and enter the house from the porch from the east and go in west, which takes you into the living room on the west side of the house, then the dining room is next; there is a partition between the dining room and the living room; there is a door in the northwest corner of the dining room which goes into the breakfast room. From the dining room you go through a door on the east side into a hall, and south of that hall is a closet; in the north of the hall is another deep nook or place where the telephone is kept on a stand. Across the hall is a door that goes into the bathroom. I think there are three steps up to the front porch. This house is on the corner of 27th street and faces south; straight across the street they were building a house at the time of this trouble.

"I think Mr. Britton's car, when I noticed him sitting in it, was past the walkway. Mrs. Britton was out at the car with Mr. Britton; I had put the dinner on the table, but had not called them, and I went and took the food and put it back in the oven and sat down to wait for them to come in when they were ready to eat. I had not heard any quarreling between the defendant and deceased up to this time; I do not know what they were talking about, I could not hear.

"While I was waiting the telephone rang and I answered it, and some man's voice was calling, he asked if Charley was there, and I told him yes he was in the front yard; I went to the living room door and said, 'Telephone, Mr. Britton.' Mrs. Britton asked if it was for her or Mr. Britton, and I told them it was for Mr. Britton; I went back to the kitchen; I did not see either Mr. or Mrs. Britton, I could hear them talking; there was no one in the house but Mr. and Mrs. Britton and myself. I am not positive which way they went when they came in the

front door; I heard Mr. Britton's voice at the telephone, and I heard Mr. Britton say, 'Go ahead and buy,' or something like that, I am not sure of the words; Mrs. Britton said, 'Buy what'? I did not hear any of the conversation nor did I hear any fussing at that time; my attention was called to the shot, it was just a short while after Mrs. Britton said, 'Buy what'. I heard four or five shots, I am not sure; I did not look out of the kitchen nor did I know who was doing the shooting. After I heard the shots I heard some one at the telephone—not very long—it was Mrs. Britton calling for an ambulance; she was dialing and I asked her if she wanted me to help her—it looked like she was just dialing over and over, and she called for an ambulance; after the ambulance came I came out of the breakfast room and went to the living room; the first time I saw Mrs. Britton after the shots were fired was in the living room; she was at the door or turning from the door when I came in; I did not see her in the telephone booth the first time she was in there; I called her when I asked if I could help her, but did not go into the telephone booth; I do not know where she went when she left the telephone the first time; when I first saw her she was turning from the living room door and I went to her; I did not know who she called, she was calling for an ambulance. I did not notice to see if her arms were bleeding at the time, she was just saying it is terrible, awful, and she said 'he tried to kill me;' she was repeating that over and over, standing at the door at the time; I did not notice whether her clothes were torn or disheveled; she came back to the telephone again and went outside, and went out near where the deceased was laying behind his car; he was bleeding, had blood all over him; I then came out doors, where she and Mr. Britton was; I don't know whether he was dead at the time; there was blood on the driveway; I first noticed blood on Mrs. Britton when I came back in the house; Mrs. Britton came in the dining room and I asked her if she remembered the number and she told me to dial '0'. After calling for the ambulance I came back in the door and about that time we went back to the door or the porch, and the

ambulance came. I did not see Mrs. Britton with the gun, and never did see a gun."

On cross-examination the witness Hansberry stated:

"The morning before the trouble in the afternoon Mrs. Britton came to the table for breakfast, she was crying and her eyes were swollen; for several days before the trouble she looked like she had been crying; the morning of the day of the trouble Mr. Britton ate breakfast and left, shortly thereafter Mrs. Britton left; in the evening Mrs. Britton returned home, and in a few minutes Mr. Britton came in; I had the meal about ready when they came in; it was not on the table; they sat down in the living room and talked for a while; after they came I put the dinner on the table, the next thing I knew he had left the house and gone out in the driveway where his car was, and was sitting in the car and Mrs. Britton was standing with her foot on the running board of the car; I then returned to the kitchen and put the dinner back in the oven. The phone rang and some one asked for Charley—that is Mr. Britton's name—and I told them to wait a minute and I stepped to the front door and called and said, 'Telephone,' and Mrs. Britton said 'Who was it for, me or Mr. Britton,' and I said Mr. Britton, and turned and walked back into the kitchen; later I heard talking and heard Mr. Britton say, 'Go ahead and buy it,' and I heard Mrs. Britton say, 'Buy what?'—and then in a short while I heard four or five shots—I thought the shots were fired in the dining room or near the telephone, the first two shots were close together, and then just a pause and it seemed like two other shots, that is all the shots I heard; when the shots were fired it excited me; I had not seen any gun, I knew Mr. Britton had a gun in his bedroom; I then heard Mrs. Britton dialing the phone over and over. I don't know whether she went out of the house or not, I called her to ask if I could help her and she did not answer. I don't know whether she went out of the front door or not; I opened the door and started in there and when I did she was turning from the front door going back toward the phone, and dialed

the phone again; she called an ambulance two or three times. She told me to call '0'; when I dialed '0' I told the operator we wanted an ambulance. Mrs. Britton was saying over and over again she had to do it, that he tried to kill her, and asked me if he was dead; she was saying over and over again, 'it can't be, but I had to do it; he tried to kill me'; I asked her what I should do, and she kept repeating, 'It is terrible,' and then she went to the phone and called an ambulance; I never saw the gun at all until the trial. The gun Charley had in the house I have seen lots of times."

On redirect examination witness stated:

"The gun Charley had in the house was a big gun; he kept it in a scabbard; when I stated when Mrs. Britton came in I did not see any blood on her arms I meant I had not noticed her arms; I had not heard any scuffling or fussing before I heard the shots; I was not excited until I heard the shots. No furniture was disarranged in the house so far as I saw after the shooting; there was blood on the table and carpet and everything in the dining room; I did not pay any particular attention as to where it started."

W. I. Eads, testifying for the state, stated:

"My name is W. I. Eads, I am a deputy sheriff of Oklahoma county; I was a deputy sheriff on the 20th day of May, 1935; I answered a call out to the Britton home at 2141 N. W. 27th Street that day; Mr. Clint Miers and also Mr. Tyler was there when I arrived, and the defendant Sue Britton was there; she was sitting in the dining room or living room. Officer Harbolt had a pistol in his possession and turned it over to Mr. Miers and Mr. Tyler; I had the pistol in my hands there at the house; we broke the pistol down to see if it had been fired empty and found that it had; it had been fired five times. We found a bullet hole in the face of the door. This was marked No. 1 on the map. There was no pellet in that hole.

"There was another hole up under the closet door inside of the telephone nook; we found a pellet there and dug it out; it was marked with a letter 'D'. I think Mr. Miers dug it out. No. 2 was probably a foot higher than No. 1; there was one other bullet mark over the buffet, it was about the center I believe, a little over seven feet; up over the door in the bathroom we found a pellet in that; this bullet hole is marked No. 3 on the map. Apparently the bullet came out or bounced out. There was also a bullet hole in the hall. We found one in the door, the outside door to the front room, it was buried in the door about three feet high, it would be the outside of the door if the door was closed. I understand there was another one found later on, I was not there."

Witness then described the sidewalk going from the driveway up to the porch, on the map.

"When I got there the deceased was dead; I noticed a wound in his right chin, it came out through the back of his head; there was blood where the remains was lying, also blood in the house; the blood started near the door and on out on the porch and off; it was along through clear to his body.

"I tried to talk to the defendant and ask her how it happened, and she was half crying, and said he had a razor and tried to kill her, seems like she did not want to talk."

On cross-examination witness stated:

"Officers Harbolt and Webb were there when we got there; then Mr. Claud Tyler came; when I got there Mrs. Britton was in the front room partly crying and sobbing, her arms were marked apparently had been cut with a sharp instrument two or three marks on each forearm about an inch or an inch and a half apart, the cuts were bleeding, not much, they were cut enough that the blood was beading through her skin. One of the bullets had gone from the dining room into the breakfast room; the gun had to be in the dining room, the dining room side

of that jamb was powder burned, and this bullet had gone through ranging slightly upwards into the telephone nook and had gone some where. This hole is designated as number one on the map. On the wall in the side of the phone nook and a little higher in the wall, there was another hole which has been labeled number two, and out of this they dug a pellet that has been identified as one of the lead pellets. There was a pellet found on the floor of this hall. Over in the bathroom there is another hole, the hole was made by a pellet, and that hole has been labeled number three. The next pellet hole we found was in the front door. The bullet had gone into the door and stuck. We found there was a chair which had been backed up in the hall that a bullet had gone right through the top of the chair and stuck in the wall; I am not sure they got it out of the wall, but I believe they did; that accounts for four bullet holes in the house and four pellets. I do not know whether the hole in the bathroom where the bullet was dropped down in a cavity was further investigated or not. I do not remember anything about a large hall lamp in the room. A photograph of the interior of the house marked 'Exhibit B,' for the purpose of identification, admitted in evidence without objections. A number of photographs of the interior of the house, and several pages of examination was taken up by cross-examination tending to establish the relative position of the bullet holes in the house and hall."

On redirect examination state's exhibit No. 6, a picture of Mr. Britton, the deceased, was offered showing a wound in his chin. Witness was examined at length with reference to bullet holes in and around the rooms in the house.

On recross-examination witness stated:

"The markings on the end of the razor was a little stained, looked like blood but was not enough to definitely swear it was blood; the razor was laying on the floor and it looked like there were some fingerprints on

it; I could not tell who had examined it. I am not a fingerprint expert."

Clint Miers, testifying for the state, stated:

"My name is Clint Miers; I live in Oklahoma City; am connected with the Bureau of Criminal Identification and Investigation, at the Statehouse; have been there a year the first of July. On May 20, 1935, I was with the Oklahoma City police department, with the homicide squad; on the 20th day of May, 1935, I went to 2141 N. W. 27th street, where C. J. Britton met his death; reached there some time between 4:30 and 5 o'clock; officers Webb and Harbolt, scout car officers, and Billy Eads, a deputy sheriff, was there; I went in the house and investigated the interior; it was getting late and I made notes of what I .found; made an examination of the bullet holes, and found some that appeared to have been recently made; Mr. Eads went with me when I was making the examination; we commenced examining near the dining room door leading into the hall to the bathroom. Witness then explained the relative positions from the map that had been introduced in evidence.

"I made notes of the interior of the house and what I found there and have these notes with me. The telephone nook was three feet four inches in depth, and four feet in width; the telephone was in this nook; there was also a chair in there, and a desk running across the back of the nook; there was a bullet hole in the door facing on the west side of the telephone nook; another five feet from the floor to the bottom of the hole and came out about five feet and one inch from the bottom of the door facing; the facing was powder burned; this has been designated as No. 1. There was another bullet hole in the wall facing the telephone nook, in the east side of the nook facing the bathroom; this hole was six feet seven and one-half inches from the floor, and two inches north of the corner, and has been designated as hole No. 2. We noticed a bullet hit between the bathroom, which had been given No. 3.

"The next morning we made an investigation and Claud Tyler found another bullet hole in the front door; when we went away in the afternoon we left the house in the same condition we found it. The house was locked and I carried the key away. We returned about the middle of the next morning. We found a bullet hole the next morning we had not seen the previous afternoon, it was through a dining room chair and stuck in the wall; that bullet hole has been designated as hole No. 4. The bullet hole in the front door we designated as No. 5.

"Pellet No. 1 was picked up in the hall leading from the dining room to the bath, and was marked for identification with a circle on it; pellet No. 2 was taken out of the telephone nook six feet and seven and one-half inches from the floor, was hole No. 2. We marked that pellet with a letter 'D'.

"We found the pellet stuck in the wall that had been through the top of the chair, and marked it No. 4; for identification we marked it with two little '11.' We found a pellet in the front door, it entered about three feet, eight inches and a half from the bottom of the door, and 19 inches from the west edge of the door when opened. We marked this with 'xxx'. There was another bullet brought to me the next day. I did not know the person who brought it. I marked that pellet with a letter 'M'. I was out in the front yard of the defendant and the deceased when the pellet was given to me."

Then follows several pages of questions and answers of the witness Clint Miers with reference to the surrounding, and the markings of the pellets found in and around the house.

On cross-examination witness stated he got out there some time around 5 o'clock. His cross-examination developed nothing new or different from his direct examination.

J. F. Bullard, testifying for the state, stated:

"My name is J. F. Bullard; I am 62 years of age, and have known Charley Britton several years; worked for him on Reno and on 15th street, and worked for him three years on 23rd street, at the barbecue stand; Mrs. Britton worked there some of the time until she was operated on; I remember when Charley Britton was killed, but I do not remember the date; I was working at his barbecue stand; Mr. Britton left about three o'clock and went with his brother to take some things to the camp; he was driving his own car; after he left a man came to 28 N. E. 23rd street, at the barbecue stand, and wanted to sell some hickory wood; we used hickory wood to cook the barbecue with. I had a conversation with the man who wanted to sell the wood, and called Mr. Britton at his home, 4-7026, a woman's voice answered the phone and I asked if Mr. Britton was there. Mr. Britton came to the phone and I told him there was a man there wanting to sell some hickory wood, and he said, 'Go ahead and buy it, John'; I handed the receiver to this man who was there eating at the barbecue stand and told him, 'Here he is; you talk to him.' This man holloed hello twice and said, 'There is an awful commotion over there,' and I said, 'Call him again'; I never heard him say a word, just hello. That was about 4:30 in the afternoon."

Pete Nation, testifying, stated:

"My name is Pete Nation; I live at Jones Spur; on the 20th day of May, 1935, I was working for Boddie Lumber Company; I went to C. J. Britton's barbecue pit to talk to him about selling him some hickory wood; I had talked to him prior to that time; Mr. Bullard called Mr. Britton over the phone, and said, 'I have Mr. Britton on the phone and he wants to talk to you.' I said, 'Hello, Mr. Britton, how about the wood?', and he said, 'I guess I had better buy it.' About that time I heard a commotion take place. I heard some shots, and sounded like something fell; that was all the conversation I had with Mr. Britton. I kept hollowing, but could get no answer; I heard something fall, sounded like a table, about the time I heard the shots."

Floyd Hughes, testifying for the state, stated:

"My name is Floyd Hughes; I am 24 years of age, live at Tuttle, Okla.; was working on 27th street in Oklahoma City, on the afternoon of May 20, 1935; I heard shots across the street from where I was working; I was standing at the southwest corner of the house, on the way to get some stone for the stone masons; my employment was to help the stone and brick masons; when I heard the shots I looked toward the house across the street to the north, I did not see anyone; when I got to the curb I saw a man coming out of the house, and then off the porch, a lady came out on the porch facing east and fired a shot; she had a gun in her hand when she came out; the man was about eight or ten feet south of her when she shot, he staggered and turned around; he went on the driveway back of his car and just let himself down on the driveway. After the woman fired the shot she went back in the house; Mr. Britton did not stand at the back of his car any length of time, he kindly turned around and let himself down. I saw blood on him, I went over to where the body was, the blood was all over him, I think the man was dead when I left where the body was; I noticed a wound in his neck; there was blood on the porch and walks where he came out.

"Where I was working there was a brace in front of the garage made out of fir; I found a hole in it where a bullet had gone through this two by four; I never saw the bullet until some one handed it to me, and I do not recall who handed the bullet to me. I kept it until I handed it to Mr. Tyler. I did not know Mr. Britton. I do not remember whether I gave the officer my name when I handed him the bullet or not, I told him at that time where I lived. This is the first time I have testified in this case."

Ernest P. Bridges, testifying for the state, stated:

"On May 20th, 1935, I was living in Oklahoma City, working at the carpenter's trade. I think I was working for Mr. Cashion, bossing a job at 2140 N. W. 27th street;

about 4:45 I heard a report like a backfire of an automobile; I was in the front room of the building and looked out of the window and somebody called my attention to a man across the street in the driveway holding on to his car; he soon sank down to the pavement; I went over to the curb and could see he was bleeding; after I saw the man go down I saw a woman come out of the house; I did not see any shots fired; while I was there I saw a white woman make two trips out to where the man's body was. Where I was working there was a scaffling or two by four across the garage of soft lumber; the next day after the shots were fired I examined the brace and found a hole like a bullet hole; I did not tell John Long that I did not know for sure it was a bullet hole; he tried to bring me out and get me to say that, and what I thought it was; we did not discuss the range of the bullet. I only heard one shot. A white lady came out of the house after I saw the man at the car; at one time I saw some blood on the woman's arms, not very much blood; I never did go up to the house close enough to see blood on the porch; if a bullet was found where the house was being built it was not called to my attention."

S. S. Burgett, testifying, stated:

"I was working at 2140 N. W. 27th street on May 20, 1935, doing carpenter work; about 4:30 to 5:50 I hear sounds that attracted my attention; first I thought it was a fire cracker; I was just west of the house at 2140; I did not see the man who come out of the house at 2141, but when I looked up I saw him on the sidewalk, he was staggering and sinking to the ground; he walked down and placed his hand on the car and fell on the driveway behind the car."

George Grinter, testifying, stated:

"On May 20, 1935, I was working at 2142 West 27th Street, south of 2141, doing plumbing work; I saw a lady at 2141 come out and fire a shot at the man, and the man walked from there to his car and let himself down by the

bumper of the car and died; I was in the yard at 2142, in front of the house; the woman fired the shot from the front porch right at the door that leads on to the porch; I think there is a couple of steps up from the walk to the porch floor; after the woman shot she went back in the house and then came out again after the body was lying in the driveway; I saw the gun in her hand, and I think the man was dead by the time he reached the driveway; I do not know what was done with the body, as I left before it was moved."

The state asked witness Grinter several questions as to his testimony in the preliminary trial, the substance of which when given was the same as the testimony he was giving in the present trial.

Floyd Hughes was recalled and examined by the county attorney, Mr. Morris, and the witness stated that in May, 1935, he was living at home with his people east of Tuttle, Okla.; he went back and forth to his work; that he had been working in Oklahoma City about two months previous to the time he was testifying; he went back and forth part of the time, as his car was worn out and he thought it better to stay here until he could get another car.

Witness identified the defendant as the woman he claims to have seen come out on the porch of the Britton home and fire a shot; "I saw the woman out in the yard after the shot was fired."

Dr. Pat Lawson testified as to the question of the complaint or information at the preliminary hearing, and the court finally, over the objection of the state, admitted it to be introduced in evidence, and was asked by the county attorney if it was his signature and answered, "Yes."

Dr. Lawson stated when a jugular vein in a human body is cut or severed by some foreign object such as a bullet, it flowed a steady stream of blood. The county attorney asked, "Does it squirt or flow?" and the doctor answered, "I don't know."

On cross-examination Dr. Lawson stated that he was police physician at the time of the killing.

"I did not go to the scene of the tragedy, but I examined Mr. Britton's body. I took care of Mrs. Britton's cuts in the matron's office at the police station; it was probably 30 minutes after she was brought in before I saw her; I paid no attention to her mental condition. I was busy—she had cuts on both arms and I bandaged them."

On redirect examination witness stated:

"The blood in the arteries is pumped from the heart; in the jugular vein the blood comes from the brain flowing back to the heart from the head; there is little pressure behind it."

On recross-examination witness stated:

"The jugular vein is one of the largest veins in the neck and a puncture of that vein causes a large discharge of blood; when the jugular vein is cut or opened it takes a very short time for a person to bleed to death."

Carl Traub, testifying for the state, stated:

"My name is Carl Traub; I am a justice of the peace, and as such I am ex-officio a coroner; I acted as coroner on the body of C. J. Britton, at 2141 N. W. 27th street; when I first got to the Britton home his body was lying out in the driveway behind the car that was parked on the driveway.

"There was a puddle of blood at his body, and blood all over his body. The body was removed and taken to Watts-McAtee; I examined the gunshot wound which

went in his chin and came out some place in his neck; there was another bullet wound across the chest. Britton's death was caused by the gunshot wound."

Frank Gow testified:

"I was working in the city police department during the month of May, 1935, doing photographic and finger print work; I was called out to view the body of C. J. Britton, who was killed in the northwest part of Oklahoma City, and made some pictures; I examined the gun and razor for fingerprints. The gun and razor presented to me are the gun and razor turned over to me by Clint Miers; I found one fingerprint that was the same type pattern to Mrs. Britton's print, but I could not swear it was her print; there was more or less an indistinct print, but I could tell the type or pattern; the outline on the gun showed to be the outline of a small finger."

The cross-examination of the witness is about the same as the direct examination.

Clyde Foster, testifying for the state, stated he knew a man named Jim Sanders, that he had worked for him; he knew the defendant, Sue Britton, for about a year and a half:

"Sanders worked for me approximately six months; she was at my place of business during the time Jim Sanders worked there; I saw the defendant at my place in company with Sanders; some of the salesmen had floor duty; two or three times when I was at the place I saw Mrs. Britton there, and when the place was closed Sanders rode away with her in Mrs. Britton's car."

On cross-examination witness stated in substance the same as he did on direct examination as to the times he saw the defendant at his place of business with Sanders, and his driving away with her in her car.

Ann McTeague, testifying for the state, stated:

"I am acquainted with Jim Sanders; know Miss Northcutt, I knew her when she was married to Jim Sanders; I went with Clida Northcutt, who was formerly Mrs. Jim Sanders, to Jim Sanders' apartment one time; it was late in October or November; Mr. and Mrs. Sanders was not living together at the time. Mrs. Sanders and I was looking for a place to move to and we drove by the Studebaker agency, where Mr. Sanders was employed, and he asked us where we were going and we told him to look for a place to move, and he asked us to wait a few minutes and he would drive us around; he told us to go to his apartment at 409 N. E. 10th street and he would be over soon. While we were in the apartment we found some pictures of Mrs. Britton; on the desk in the living room was a picture of Mrs. Britton, the defendant here, and in a closet wrapped up in some house dresses and a night gown a large picture, 8 x 10, of Mrs. Britton, and in the linen closet behind some towels we found just an ordinary fountain syringe, and I believe we found a box of verotrol, cold cream and some powder. We stayed there some time, but Mr. Sanders did not come; while Mrs. Sanders was in the back part of the apartment some one knocked at the door, and I thought it was Mr. Sanders and started to open the door because it had a Yale lock; just as I got near the door it was unlocked and the defendant came in; about that time Mrs. Sanders came in and Mrs. Britton asked where Jim was; Mrs. Sanders said, 'I am Mrs. Sanders, what is it you wanted,' and Mrs. Britton replied, 'I have a message for Mr. Sanders.' Mrs. Sanders asked her not to come back to the apartment, and Mrs. Britton backed from the apartment and I think left; I don't know what Mrs. Britton did with the key."

Clida Northcutt stated she was the divorced wife of Jim Sanders, and corroborated in substance the testimony of Ann McTeague as to being at Jim Sanders' apartment one time when Mrs. Britton came to the apartment and unlocked the door and came in.

108

W. R. Payne was then called and testified he was assistant cashier in the First National Bank & Trust Company; that an inquiry was made as to the account that was carried in the bank in the name of Sue Newcomb. The testimony of Mr. Payne shows the name in which the account was carried, and the amount of money deposited at the time of the killing. This testimony was admitted over the objections of the defendant.

Claud Tyler was then called as a witness for the state and testified he secured the clothing worn by the deceased at the time of the killing from the undertaker, and described the clothes deceased had on when killed, and was further examined as to the furniture and conditions of the house at the time he reached there after he learned of the killing.

The foregoing is in substance the testimony of the state deemed necessary to include in this opinion. When the state rested, the defendant interposed a general demurrer:

"On the ground and for the reason that the state's testimony taken together is wholly insufficient to warrant a conviction or sustain one if said conviction were had."

J. H. Long, the first witness called by the defendant, stated he lived in Oklahoma City; that he had been engaged in work in the state, and in the Bureau of Identification for the state. He went to the Britton home and made an investigation, and detailed what he found as to bullet holes in the different parts of the house and walls, and stated he was present when the photograph was taken of the interior of the Britton home, and described in detail the different points of investigation he made while he was at the home. Witness also testified as to the

range of bullets, when they struck hard substance they might be deflected, but it would not deflect in soft substance or flesh.

Forrest Taylor, testifying for the defendant, stated he had been handling guns and shells for many years, and stated at Mr. Smith's request he went to the Britton home and was present when Mr. Grinter took a big iron rod that was placed in the bullet hole, and placed it up against the wall adjacent to bullet hole No. 2, and then described the different angles of bullet holes and went into detail as to where and from what direction they must have been fired. Witness identified the picture taken while he was at the house. Referring to bullet hole No. 2 in the wall in the phone nook:

"I made as careful examination as I could of the hole in the wall while they were placing the rod in it; I got a chair and got up on the top of the chair, and it looked like as though it would have been impossible for it to have gone through at this angle; it seemed to have gone straight in."

G. E. Grinter, testifying for the defendant, stated he saw the photograph made of all these bullet holes while out at the Britton home; that he took the picture identified in the picture as defendant's exhibit 8; that the steel rod was through bullet hole No. 1 against the telephone nook wall; that the rod was straight.

"We took a picture of bullet hole Nos. 1, 2, 3, and 4; then took a picture of the hole in the door known as No. 5, and witness then described these bullet holes."

Clint Miers, recalled for further cross-examination, stated:

"When I got out to the Britton home I noticed where the trail of blood started and where it ended; it started

along by this door in the dining room and went right on out through that door, there was considerable blood, I could not estimate how much; I did not notice a pool of blood in the dining room, it was splattered around, the rug was stained, there was a trail leading on out of the living room door and it had the appearance of the probability of a man was bleeding, as he went along, from the neck. It would be hard for me to say if there was more blood in the house than on the outside. There were 30 inches between the dining room table and the buffet setting on the east side of the dining room. The dining room table was setting four feet and four inches from the nook, and four feet from the breakfast room door; the door was 30 inches wide; there was blood on the buffet, some on the table, and blood on the wall down next to the floor."

Earl Kohn stated:

"I knew Charley Britton in his lifetime, for ten or twelve years; knew him in April and May, 1935; I was in Joplin with him about the middle of November, 1934.

"When I went to Joplin with him in November, 1934, I saw Frona Norman; when we went to the hotel to register I met her; Mr. Britton registered for us both; he usually registered under the name of C. Davis; I would say Frona Norman was 38 or 39 years old, had light hair, and I would say a fair complexion, blue eyes, and would weigh about 120 pounds, five feet three or four inches tall; I do not remember the number of the room Mr. Britton occupied, it was a front room, I don't know if it had a number. It was a large room. I have been to Joplin on other occasions with him and he registered in the name of C. Davis and occupied the same room when I was there with him. I have seen Frona Norman in the room with him, I am not sure whether it was late at night or not, but she was up there until I went to bed; she was there with him early one morning; I called him and he came to the door and said wait a minute; he was partly dressed and she had a bath robe on; to my knowledge Charley Britton occupied that room three times. The first time

I met Frona Norman we all went to supper together, Frona sat with Charley at the table. When we first went to the hotel and registered Frona Norman embraced Mr. Britton; we were there another time in January, 1935; when we went in Frona came up and threw her arms around Mr. Britton and kissed him. I did not stay at the hotel that time. I got back to the hotel about eight o'clock the next morning. They were not up at that time."

On cross-examination witness stated altogether he made three or four trips to Joplin with Mr. Britton.

"Mr. Britton said he went on business and I drove for him; I do not know what his business was; we drove a Ford car each time we went; if I was to state what I did, it would incriminate me. I did not tell Mrs. Britton what I had seen while in Joplin; the day of the shooting I was here in town, but I do not remember just where I was. I had worked for Mr. Britton about three months. I know Mrs. Britton went to Joplin with Mr. Britton, but I do not know how many times. One time when we were there we went to supper with Frona Norman and two other girls went with us."

E. B. Jeffries was called as a witness and stated he lived in Oklahoma City; was district manager for the Southwestern Bell Telephone Company. Witness identified a telephone directory for ten towns in southwest Missouri, including the directory for Joplin, and stated it was an official directory of the company published July, 1934. Witness also identified a directory as being the official directory published June, 1935. The telephone number of the Worth Hotel in Joplin was 1748, at 323½ Main street; witness also identified a listing of a telephone for Frona Norman's apartments at 203 North Joplin, the number of the phone was 1537, on January 20, 1935, the number was installed.

Defendant's exhibit F is a long distance call to Joplin, on May 5, 1935, which shows to have been made from

4-0039, Ozark Pharmacy; this call was placed to telephone No. 1748, Joplin, Mo., which was the Worth Hotel or Oklahoma Hotel; witness also identified a telephone call May 17, 1935, from 4-0039, Oklahoma City, to No. 1537, Frona Norman's apartment number; there was a second call on that day from the same number to the same number; the tickets showing the calls were introduced in evidence.

On cross-examination witness stated he did not know anything about the calls excepting the record of the tickets which had been introduced in evidence; he did not know who was at the Worth Hotel and talked on the call; the calls were put in under different names.

Charles B. Taylor, called as a witness, stated he had been a practicing physician for 30 years; he knew C. J. Britton, who came to him in 1932; on July 11 the first time:

"I made an examination of him and found he had syphilis; about three weeks later I made an examination or test of Mrs. C. J. Britton, which test showed she had syphilis; they would come in together many times and I would treat them; both regretted very much they had syphilis; Mrs. Britton accused Mr. Britton several times of giving it to her and he did not deny it; I could not tell from the treatments whether he gave it to her or Mrs. Britton gave it to him; I was treating him at the time of his death. Mr. Britton did not accuse Mrs. Britton in my presence of giving him the disease. I sent Mrs. Britton to Dr. Brundage, skin specialist, because of a peculiar skin eruption that I did not understand. The syphilis in this case was very definitely acquired and genital, it was not hereditary syphilis."

Dr. Brundage was called as a witness and stated he was a physician and specialized in dermatology and syphilology:

"I treated Mrs. C. J. Britton February 12, 1935; she was suffering from a secondary eruption on her face and back of her neck; I mean by secondary it is a hemp colored pupular eruption and in her case is arciform; I mean by that it has a disfiguring and eruption as characteristic not pathetic pneumonic syphilis. I could not tell definitely how long she had been suffering with it, just have to estimate it, I would say all the way from six months to six or eight years. I gave her fever therapy treatments; I am still treating her. I recall the time her husband was killed; she was in my office that day. I never treated Charley Britton."

Mr. E. A. Schmidt, testifying, stated he lived at 521½ North Broadway, Oklahoma City, Okla.; he was room clerk at the Skirvin Hotel; "I did not know Charley Britton nor did I know Frona Norman." Exhibit X is a Skirvin operating company's record of local telephone calls made from Mr. C. Davis' room here in the city. The number called is 4-0132, which is the Britton Barbecue Stand; witness was further examined as to other calls made to the Barbecue stand.

Gene Hoping, testifying, stated:

"I work at the Skirvin Hotel; was working there in May, 1935, and going to school at the Oklahoma University. The picture designated as defendant's exhibit P is a picture of a lady I knew as Mrs. C. Davis, who was in room 732, as I recall; that was on May 5, 1935; she was there from the fifth to the tenth, inclusive; she said she had a hotel in Joplin; she did not tell me her name, she was registered in the name of Mrs. C. Davis."

H. W. Hakes, testifying, stated:

"I live in Oklahoma City, and am associated in the bakery business known as the Simmons Bakery; I own and rented property at 323 West 7th street, Oklahoma City, to Mr. and Mrs. Jim Sanders, in the winter of 1933 and 1934; I could not tell just when they were there, it was

prior to March 15, 1934; I saw some whisky there and the neighbors complained and I told them to move."

Frank P. Durbon testified he was in the advertising business and had been at the Britton Barbecue Stand several hundred times; that he bought a little cider or whisky:

"Mr. Britton hired me to put some ads in the paper for him; I carried some advertising bills for him with reference to a hotel in Joplin, in the fall of 1934; he also talked about putting some ads in the Tulsa World and advertising in other ways."

Frank Newcomb stated he lived at Choctaw:

"I am a brother of Mrs. C. J. Britton; the difference in my age and the age of the defendant is about four years; she was of a highly nervous disposition; my father was the same way, had a high temper."

On cross-examination witness stated his father was 80 or 81 years old at the time of his death.

Arnold Britton testified:

"I am adopted son of the deceased; I was quite small when I was adopted; I have always used the name of Britton; my father treated me well, he was always good to me; he was the only father I ever knew and naturally, of course, I was fond of him; I had an opportunity to observe my father and mother together during my young days and so far as I knew they had all the kindness and consideration in the world for each other; my father was kind and affectionate up until a few months before his death."

The defendant, Sue D. Britton, testifying in her own behalf, stated:

"My name is Sue D. Britton; I was born about nine miles east of Oklahoma City, and as a girl I was reared in this county; I was 16 years of age when I married; I was about ready to graduate from the eighth grade when

I married; I was married two and a half or three years the first time. This young man who has just testified is my son; I was divorced, and met Charley Britton about 22 years ago. I was living with my father and mother, but was visiting my brother here in town when I met him; I had kept company with him about a year and a half or two years before we were married. After we married we lived in different places, and worked at different things; he worked as a waiter, with the street railway company, with the Ford Motor Company, and as a plumber. He went into business for himself in 1928 or 1929, first on Reno, and after he quit business on Reno, he opened a barbecue stand in the 1700 block on West 16th street; and later opened up the place at 28 N. E. 23rd street; I helped him in the business when I was able; Arnold was three or four years old when Charley and I married. Mr. Britton treated him as his own son and was wonderful to him; our first trouble occurred in the spring of 1932; just prior to that time I had undergone an operation on March 10, 1932, at St. Anthony's Hospital; they removed all my female organs; after I recovered I resumed normal relations with my husband; in June, 1934, my husband got sick, he said he had an ulcerated condition of his privates; I finally persuaded him to go to a doctor; I had no idea what the trouble was; Charley took me to Dr. Taylor, and they examined me and told me what was wrong with me; he did not tell me exactly how he contracted it, but he told me he got it through sexual relations with a woman. I agreed to go with him and take treatments and continue to live with him. I had an ulcer start in my nose and it seemed to spread and the whole nose became infected; it continued to the lips; I had a similar place on the back of my neck; I could cover that up but I could not cover up my nose, my nose was too enlarged; that condition developed in September, 1934; I was so near crazy from the affliction that I went to Dr. Brundage; Dr. Taylor may have suggested Dr. Brundage to Mr. Britton. I went to Dr. Brundage and he gave me typhoid germs and set up a fever reaction to burn that off; I was laid up for twelve days. My hus-

band's attitude toward me changed; he did not want to kiss me any more, and I could not blame him; he told me I was repulsive; he told me he wanted to get rid of me. I don't remember exactly, but he told me that two or three times; shortly before the killing I received information over the phone that my husband was mixed up with another woman; I did not know who it was that called me. Some time in March, 1935, I received further information as to my husband being mixed up with another woman. The man told me my husband, was crazy about a woman in Joplin, and that he was keeping her in luxury, that he did not care for me any more and wanted to get rid of me, or words to that effect. When I advised my husband of what I learned he told me he had found some one who did not have syphilis, a young woman, that he loved her, and said she was a very pretty woman. I don't remember the exact words he used. From then on our relations were strained. My husband did not tell me who the woman was, but the man over the phone told me her name was Frona Norman.

"Some time after that I suspected the woman was here in Oklahoma City. I went out to his place of business and he was ready to go to town; he did not like to park his car, and I told him I would take him down, and he said he did not want me to take him down; when he left I followed him, about half a block or three-fourths a block behind him, he parked on First street on the south side across from the Skirvin; I drove up along side the car and asked him where he was going and he said it was none of my business, or something like that; I told him I was going on home and that he might be watched. I stopped at the grocery store and when I got home he was there. I was so glad he was there when I got home I did not mention the incident to him.

"On May 15, 1935, I was at his place of business visiting with him and a friend of mine; I borrowed his car and instead of going to this friend I had been talking to over the phone I drove away and came back, but did not park the car at his place of business but parked down the street

and went around back of the building; his building was
sort of an old shack and had big cracks and crevices in the
walls where you could hear from the outside in, and in-
side out any conversation; I had quietly stood there only
a short while when he went to the cash register and got
some money, and went to the telephone and said, '1748,
Joplin.' Before he got his connection some one drove up
on the west side of the building and he asked this man
if he would loan him his car and he said 'Yes'; I went
back and got in his car, and he went to the Ozark Phar-
macy; I told him I knew what he had been doing, and he
asked me what I was going to do about it.

"The day of the tragedy I went to the doctor for a
treatment for the syphilis; I think I discussed with my
husband that morning about this woman; I had not slept
very much the night before; I told him I was going to see
Frona Norman and talk with her and see if I could not
prevail upon her to give him up, and he said I had better
stay away from her; that she was a dangerous woman,
that she was a killer and that I had better stay away,
said she had killed a man. I could not help but believe
him the way he told me, and I learned from the record he
was telling me the truth."

A copy of the transcript of a case from Cherokee
county, Kan., was introduced in evidence, showing a case
of State of Kansas v. Frona Norman, No. 3185, had been
pending in that court. The verdict returned showed a
verdict of acquittal.

"The last few weeks of Mr. Britton's life he was drink-
ing pretty hard; after he contracted syphilis he quit for a
long time, but the last five or six months of his life he
got back to drinking again; when drinking he would be-
come sullen and surley, and would take a revolver to bed
with him; he told me it was a revolver, and I saw it twice;
Mr. Britton owned a revolver and would take it with him
in his car some. When I bought the revolver I wanted to
talk with Frona Norman, I made up my mind I would

see her and have a talk with her about my husband; that I would tell her about the infection or condition I was in and she would relinquish him, that she would not try to take him from me; Mr. Britton told me she was a bad woman, and I thought I wanted the gun for a little protection; the reason I did not take the big gun was it was so large I did not know how I could carry it; I got the small gun to carry in my purse; the gun was not loaded when I brought it home; when I reached home I laid it down on the table in the living room; it was on a kind of an old fashioned library table; I had been home 25 or 30 minutes when Mr. Britton came; he was pretty much intoxicated; when he came in and saw this gun lying on the table he said, 'What are you going to do with that,' and I said, 'Well, Britt, I am going to see that woman,' and he said, 'You are not going to see her,' that he defied me; I don't know whether he said anything else or not; he told me I did not know how to load the gun, and it seemed to me one of us had it partially broken down, anyway between us we loaded it; it seems I put the shells in, and one of us laid it down on the library table; we sat down in the living room and talked. He had a bottle of what I thought was gin, and he would set it at the end of the divan and drink out of it; he was sitting on the divan; I know it was hot weather, and I was worried about his condition more than anything else. I won't say we quarreled, we talked in low tones, in fact we never did quarrel much; he asked me what I was going to tell Frona Norman, and I said, 'Well, I am going to tell her about this disease, I am going to tell her you have the syphilis, and she may be good enough to let you alone.' It seemed to infuriate him, he jumped up and dashed into the bathroom, and I went to the bathroom door and he was standing in front of the lavatory wash bowl with his razor in his hand; I asked him what he was going to do, and he said he was going to shave, and I said, 'You shaved this morning;' he was drinking and was so angry he was not himself; I asked him to eat his dinner, and he said he did not want any; I reached out and looped my fingers into his belt which he had on; his coat was unbuttoned,

and it was more of an endearing procedure—but I was not going to force him—and turned him around facing me and said, 'Are you going to shave in the evening and go see this woman'; this seemed to madden him, he reached out with his razor and hacked me on my arms; I turned loose and there was a little bit of blood, he turned and walked or ran out of the bedroom through the dining room, and through the front door; I was right behind him; I went out to the side of his car and talked to him; he was very nervous, and I told him he was not fit to drive his car, as he was intoxicated.

"When I told him I was going to see this woman and tell her he had the syphilis, he told me he would kill me before he would let me tell her; he took off his hat and run his hands through his hair, and would turn off his ignition, put his hat back on, he did not act natural, his face was white and his mouth was drawn down; he did not want anything to eat; he told me he never would let me see this woman and tell her that stuff.

"Mamie called, 'Telephone' and he seemed very nervous about the call; he got out of his car and went into the house; I closed the car door and went into the house; I came in the front door and turned into the bedroom, when I got in there I heard his voice, but I could not hear what he was saying; I went on around to the clothes closet, he was standing at the door leading from the telephone nook into the dining room; the telephone is a French phone and you can have the receiver to your ear and the telephone to your mouth; when I was looking in the direction I have described he had this telephone in his hand and was talking, and had the gun in his hand, the gun that he and I had loaded and put out on the table; I was not very far from him, about a step and a half, I could not say definitely; he turned his head and saw me and turned that gun down on me with the most insane look on his face; I did not know what he was going to do, did not know whether he was going to kill me or kill himself; I was terrified, and lunged toward him, and about that time there was an explosion, it looked to be right close to

my head; I have a faint remembrance of going to my knees, that is all, I do not know how many shots were fired. The first thing I remember was seeing Britt lying out there on the driveway; I must have gone out to him because I was looking down at him; I don't know whether I called an ambulance or not; I don't know whether I got a towel and came back and wiped his face. I did not buy that pistol to kill Charley Britton with; I would not have harmed a hair on his head; I did not want to kill him."

On cross-examination defendant stated her maiden name was Sue D. Newcomb:

"Charley Britton and I were married about 22 years ago; from the time we were married up to the time he marked me with the razor on May 20th, 1935, was the first time he ever did any physical violence to me. When we were married neither of us had any property; I knew nothing about the advertisements in the paper until after Mr. Britton's death; he had told me he was going to make a change; I knew he was using the Ozark Pharmacy phone because of his customers, and then I would follow him out of his place and see him coming out of the booth; he told me he had talked with this woman. He did not tell me he was having an affair with this woman until after he got this second telephone call.

"When he came and told me there was something wrong with his private parts I did not know what was wrong with him, he told me his clothes had rubbed him. When he told me he had syphilis it did not make me mad, but I was heartsick; I felt sorry for him and helped him doctor it; I did not plan any action for divorce. After we were married he worked some in the field at Kiefer, then opened up a place down on Reno; I did not work in the business on Reno; I think he sold whisky down there; I never saw him make any sales, I never delivered any of the whisky, never hauled any down to the place or any place else.

"The $10,079.62 in a savings deposit account in the bank, the major part of the money he and I had accumulated during our married life. The $10,000 was money he had given me, and I had a little income, we had a place at 1123 North Pennsylvania avenue worth about $1,800 to $2,000, that is in my name. Charley put it in my name and gave it to me. I have not earned any money since I married Charley Britton except to help him in his business. We have a piece of property at 309 S. E. 39th street. The title is in our joint names. This property cost $1,700 or $1,800. Then we have our home at 2141 N. W. 27th street. I think we paid $4,500 for that. The title is in our joint names.

"The $10,000 deposited in the bank was money he gave me and income from other property; I had a little money coming in, I do not recall the exact amount, $150 or $200 would probably cover it. I do not remember just when this savings account was started, probably in 1927, the records will show. All the deposits shown to have been made in the name of Sue D. Newcomb, except a small amount of income was received from my husband, that we had earned after we married. It was given to me and I deposited it in a savings account.

"I never hired a detective to investigate matters; I may have talked to some one about it, as I was dissatisfied and worried; I knew my husband made trips to Joplin in his automobile, and I believed he hauled whisky back when Kohn went with him. When I asked my husband if he was talking with this woman he said yes, 'You must be crazy if you think I would have my customers listening to my conversations with this woman.' He did not have a telephone booth in his place of business. I never filed suit for a divorce. I bought the pistol the morning before the trouble that afternoon; I have no remembrance about the cartridges."

The record contains several pages of questions and answers with reference to the defendant not carrying the big gun that was shown to belong to her husband. She

did not buy the pistol to take back and forth from the place of business when carrying money.

"Mr. Britton told me several times I should have a gun in my car, but his statement had nothing to do with me buying the pistol. I do not know whether there were any whisky or gin bottles in the front room when he was shot, but he drank some gin after he came home; he was pretty much intoxicated when he came in about 3:30 or 4 o'clock in the afternoon; he was dressed with a linen jacket which he used to wait on his customers in his place of business. I have never been in an institution for insane or feeble minded before or since Mr. Britton was killed."

Several pages of the record are taken up with reference to the pistol and whether or not the defendant had broken it down or loaded it. Defendant further stated:

"Toward the last I made a trip or two with him to Joplin, thinking if I sorter kept him from seeing this woman maybe I could win him away from her; I never helped him drive the car when it had whisky in it; I don't recall he ever stated that if there was a woman in the car he likely would not be stopped by an officer. When I was trying to see this woman I was not going to see her with murder in my heart. I bought the pistol for the purpose I have heretofore stated; I did not see Mr. Britton go into the telephone booth. When he was talking over the phone he would stand or sit in different positions. I went back in the house through the front door and around the double doors into the dining room, through that door and that clothes closet in that corner here, I thought I would be able to hear what he was saying, I wanted to be sure she was in town; I had not seen Charley before this date talking over the phone with the phone in one hand and a pistol in the other.

"I am not very well, not good and strong. Ordinarily Charley was not too strong, he was stronger than I am. All I recall hearing was something about buying some-

thing—I do not recall saying—buy what. It is not true that while Mr. Britton was talking on the telephone I went into the dining room and fired a shot at him, that I took two shots at him in the dining room, and as he ran out of the house I fired at him as he went out of the front door; I did not do that, nor did I stand on the front porch and fire a shot at him as he ran out of the house. When I got up close to him he did not draw the gun and fire, he drew the gun down toward me, and I lunged toward him and the gun went off, and from that time on I have little remembrance of what did happen; I do not remember getting up from the floor with the pistol in my hand. I don't know that I ever got the gun from him. I don't think I ever got out on the front porch and fired a shot at him. It is not true at all that Charley Britton did not know I had the gun before he went to talk over the telephone or that I shot him on the way out, or after he got out of the house, and took the razor and put marks on my arms; I have no remembrance as to what I said after the shooting, nor do I remember asking Mr. Harbolt or Mr. Webb to call Mr. Nowlin; it looks like I would have, as he was an old friend of the family. There was no stitches taken in my arm."

On cross-examination the defendant demonstrated how she took hold of Mr. Britton's belt in the bathroom. "I turned loose after he cut me." Witness then exhibited the scars where she claimed deceased cut her with his razor.

"Mr. Britton told me he was pretty deeply involved in business at Joplin; that he helped this woman get her hotel business running and things like that. In the second telephone call he made mention of a fur coat, and I told Mr. Britton that my information was he had bought this woman a mink coat, and he said he had, and that it was not any of my business.

"A suit was filed against me shortly after I was placed in jail and a restraining order issued restraining me from disposing of any of the estate or property of Mr. Britton.

Through my counsel I drew money out of the savings account to pay the funeral expenses of Mr. Britton, and the admininstration is still pending."

The foregoing is the substance of all of the testimony for both the state and the defendant that it is deemed necessary by the court to set out for the purpose of arriving at an opinion as to whether or not the questions of law raised by the attorneys are sufficient to warrant this court in reversing the case and granting a new trial.

The record in this case is voluminous, and the defendant has assigned 32 errors alleged to have been committed by the trial court, and earnestly insists that the errors committed by the court are such as to entitle her to a new trial. In setting out as long an abstract of the testimony as we have in this opinion, the court did so in order that there could be no question as to the testimony, and whether or not it was sufficient to warrant the jury in finding the defendant guilty of manslaughter in the first degree.

The theory of the state was that the defendant was infatuated with a man by the name of Jim Sanders; that she had succeeded in getting more than $10,000 of the money earned by the defendant deposited in the bank in her name; that the motive for the killing was to rid herself of the deceased to be at liberty to carry on with Jim Sanders, and to get the money that had been given her by the deceased. The court, over the objections of the defendant, permitted the state in its testimony in chief to show that the defendant on different occasions drove by the Studebaker Company's place of business in the evening and picked up Sanders in her car and drove away with him, and to show that on one occasion the former wife of Sanders and another witness were at the apart-

ment of Jim Sanders when the defendant came, using a key and opened the door and came in.

The defendant in her argument has grouped together assignments 1, 2, 3, 4, 5, 9, and 10, and discusses this testimony with reference to Jim Sanders as being testimony improperly admitted, insisting that it put the character of the defendant in issue before the defendant had put her character in issue, which was an error under many holdings of this court in many cases.

In Alexander v. State, 35 Okla. 89, 248 Pac. 873, this court said:

"The state cannot attack the character or reputation of a defendant in the first instance, but, when a defendant puts his character in issue by introducing evidence of his good character, the state may then offer rebutting evidence to impeach his good character." Jones v. State, 20 Okla. Cr. 154, 201 Pac. 664; Kirk v. State, 11 Okla. Cr. 203, 145 Pac. 307.

The authorities cited by the defendant sustain the general proposition of law that the state or the prosecution cannot attack the character or reputation of the defendant in the first instance, but must wait until the defendant has put his character in issue by introducing evidence of good character, but in this case the theory of the state is that the association of the defendant with Jim Sanders was a part of the motive of the defendant to get rid of the deceased. It is always competent to show a motive for the act in criminal cases and the prosecution in presenting its testimony in support of what it contends was evidence offered as to the relations and friendship of the defendant to Jim Sanders was admissible. The question then to be determined is, Did the court err in admitting the testimony of the witnesses showing the defendant's association with Jim Sanders?

The state in presenting this testimony contends it was admissible to show the motive and scheme of the defendant to get rid of the deceased, citing in support of its contention Berrie v. State, 55 Okla. Cr. 302, 29 Pac. 2d 979.

In Barrett v. State, 57 Okla. Cr. 259, 47 Pac. (2d) 613, this court in the second paragraph of the syllabus said:

"In prosecution for murder of accused's daughter by strichnine poisoning, accused's illicit relations with another girl and infatuation for her which caused accused to assist in supporting her and her illegitimate child held sufficient circumstantial evidence to establish corpus delicti."

In Tingley v. State, 16 Okla. Cr. 639, 184 Pac. 599, in the first paragraph of the syllabus this court said:

"It is discretionary with the trial court, in furtherance of justice, to permit evidence in rebuttal which would have been competent evidence in chief."

The record discloses that when the defendant was testifying her counsel inquired of her as to her relation and connections with Jim Sanders, and she denied any improper connections or relations, but did admit she had driven by the Studebaker Company on one or more occasions and picked up Sanders at the request of her deceased husband. The evidence complained of could unquestionably have been introduced in rebuttal in support of the state's theory as a part of the motive for the killing of the deceased.

We do not think the action of the court in admitting this testimony as testimony in chief showing the relations between the defendant and Jim Sanders was an error.

The defendant argues at length and with a great deal of earnestness that the court erred in permitting the state, over the objections of the defendant, to introduce evidence as to the amount of money in the defendant's savings account at the time of the death of her husband. The defendant in her testimony admitted that when she and the deceased were married they did not have any property; and that the money and property they had on hand was an accumulation from the earnings of the defendant and deceased after their marriage, save and except a few dollars income from other sources that the defendant had. She admitted that the money in the savings account to the credit of Sue D. Newcomb was money that had been given and turned over to her by her husband. As the state offered this testimony on the theory that this money formed a part of the motive for getting rid of the deceased, and the defendant admitted the amount of money, and that it was given her by the deceased, it was not error for the court to permit the state to introduce the evidence as to the savings account. It is not deemed necessary to go into the question of the admission of this savings account in detail or at length. Suffice it to say we hold it was not error to admit the evidence and the rights of the defendant were not prejudiced thereby.

In R. C. L., vol. 8, p. 910, under the subject of homicide, it is stated:

"Where the purpose of the evidence is to disclose a motive for the killing the courts are very liberal in permitting its introduction, and anything and everything that may have influenced the prisoner to commit the act may as a rule be shown."

In Sapp v. State, 87 Tex. Cr. 606, 223 S. W. 459, 463, the court said:

"The state's theory was that a conspiracy existed between appellant and others having for its principal object the getting of the money and property of the deceased."

In State v. Mortensen, 26 Utah, 312, 73 Pac. 562, 633, the Supreme Court held:

"Where the state's theory in a prosecution for homicide was that defendant killed deceased in order to get possession of certain papers evidencing an indebtedness, without making payment, evidence representing the amount of the defendant's bank account at the time was admissible."

The defendant through her counsel in their able discussion contends the court erred in the admission of the evidence of the savings account, and relations with Jim Sanders, and that it was prejudicial to the rights of the defendant. If the court understands the record correctly, it is in the nature of a threefold defense, and the argument presented in the brief confirms that opinion.

The defendant contends the deceased had the combination telephone receiver and transmitter in one hand, and the pistol in the other when she went to the telephone nook and turned toward her with the pistol, and a scuffle ensued and the pistol went off. The next defense is that she did it in self-defense because he was trying to kill her; and third and last, that when the trouble came on she was insane to the extent that she did not know what took place. Therefore it becomes necessary for the court to carefully examine every phrase of the record and arrive at what the facts were that brought on the difficulty and resulted in the life of the deceased being taken.

It is argued by the defendant that there was improper testimony permitted to go to the jury by the court on the question of the pellet, or bullet that was claimed to have

been found across the street from the Britton home where a building was going up, and this is presented by the defendant, contending that it prejudiced her rights before the jury. This testimony, as we view it, was immaterial to a final determination of the facts by the jury, as it clearly shows that if the pellet found was fired from the pistol of the defendant, it was fired after the deceased had left the house and was fleeing, and only a moment before he fell on the driveway at the rear of his car.

In presenting the pellet claimed to have been found, the prosecution did not lay the proper foundation for its presentation, but the failure of the state to do so and the admission of this bullet by the court is not such an error as would warrant the court in reversing the case, nor does the court believe that the admission of this pellet or bullet in any way whatever influenced the jury under the facts in this case in arriving at its verdict of guilty.

In the trial of all cases it is highly important that the court should permit only evidence that tends to substantiate the theory of the state or the defense. Many courts have held that when a husband was being tried for the murder of his wife, where the prosecution undertook to show that the motive of the accused was the infatuation for another woman and created within him a desire to get rid of his wife, the well-established rule is that trouble between the husband and wife prior to the homicide and continuing up to that time, and tending to show improper relations with the other woman prior to the homicide is competent.

It is not disputed, but, on the other hand, it is admitted by the state that the defendant is entitled to a fair and impartial trial, and it is the duty of the court to see that the defendant is accorded a fair and impartial

trial, and that no incompetent evidence is permitted to go to the jury, and it is the duty of the court to correctly advise the jury as to the law when applied to the facts before it, and when the court fails to perform this duty it is an error sufficient to warrant the court in reversing the case.

In the case now being considered, while many errors have been assigned by the defendant, they do not possess merit sufficient to warrant this court in reversing the case. The court feels it is its duty to briefly discuss the issues presented to the jury under which it returned its verdict of manslaughter in the first degree and imposed the sentence of ten years.

The facts in this case clearly show that the deceased and defendant when they were married were without means; that the deceased worked at different places and finally opened up a business and began to accumulate money and property; that at different times during their married life deceased turned over to the defendant a savings account in her maiden name, Sue D. Newcomb; that at the time of the death of the deceased she had more than $10,000 in this savings account; that the deceased and the defendant owned some real estate.

The evidence further shows that a few years before the trouble, the deceased contracted syphilis and transmitted it to the defendant; that they both had been suffering from the loathsome disease, and both had been treated by the same physician with the knowledge of each other what the ailment was.

The effect of this disease upon the defendant was humiliating and embarrassing and caused her to have sores upon her nose and lips; that she was finally treated

by a specialist, and to some extent the sores and breaking out were healed and remedied.

During this time the defendant was seen on several occasions to drive up to the Studebaker place of business and pick up Jim Sanders in her car at the closing hour and drive away with him in her car. The defendant admits she would drive down and get Sanders, but states that it was at her husband's suggestion and request. She was seen at the apartment of Jim Sanders one day and with a pass key came into the apartment, finding Sanders' former wife and another woman in the apartment at the time.

On the part of the deceased the testimony shows he had become infatuated with a woman by the name of Frona Norman, of Joplin, Mo.; that he made repeated trips to Joplin and the woman on more than one occasion had been in Oklahoma City, and had registered at one time under the name of Mrs. C. Davis. The relation of the deceased and Frona Norman was by an anonymous telephone call imparted to the defendant. When this information was received, the defendant began to investigate and watched the deceased, until she finally obtained positive proof of the infatuation of the deceased for Frona Norman, and when she questioned him regarding his conduct with Frona Norman, he admitted he had been with her, telling the defendant she was a good looking woman, and that she did not have any loathsome disease, or words to that effect, and asked the defendant what she was going to do about it.

The defendant says she advised the deceased she was going to see the woman and try to get her to leave him alone; the deceased told her not to do so, that Frona Norman was a dangerous woman, that she had killed a man,

which the proof in this record shows she had, and for her to leave her alone. The deceased then asked her what she was going to tell Frona Norman, and she advised him she was going to tell her about the disease and defendant being infected with syphilis, and the deceased replied that he would kill her before he would let her tell Frona Norman about his having syphilis.

Coming down to the day of the trouble, the maid who was working for the family states:

"The morning prior to the trouble in the afternoon the defendant came to breakfast, and looked like she had been crying, that the deceased ate his breakfast and left immediately."

The defendant states that several days prior to the date of the difficulty the deceased had been drinking heavily, and when she talked to him about Frona Norman, he threatened to kill her before he would let her tell Frona Norman his condition.

It is clearly shown by the record that prior to the date of the killing, the defendant did not own a pistol or revolver, but the morning of the killing, shortly after the deceased left their home, the defendant drove toward the city. The record further shows that the defendant went to the doctors and was treated for her ailment and then drove back by a store dealing in sporting goods and bought the pistol and some cartridges; that she returned home about 30 minutes before the deceased came. The maid says she had their dinner ready to put on the table, as they usually ate about 4:30 to 5 o'clock in the afternoon; that the defendant came into the bedroom and a few minutes thereafter the deceased came in; she heard them talking, but could not understand what took place or what was said.

The defendant states she and the deceased had a conversation in the house, and deceased went into the bathroom, and when she went to see what he was doing he had a razor in his hand, and she reminded him that he had shaved that morning and asked him if he was going to shave again and go to see that woman, and that he hacked her two or three times with the razor and caused her arms to bleed. The maid further states about the time dinner was on the table the phone rang and some one asked for Charley, meaning Mr. Britton, and she went out on the front and Mr. Britton was out in the driveway in his car and Mrs. Britton was standing with her foot on the running board talking to him; that she said, "Telephone, Mr. Britton," and Mrs. Britton asked, "For me or for Charley?" and she advised them it was for Charley. Mr. Britton got out of his car and came into the house and went to the telephone nook in the house.

The defendant admits this statement and admits she followed her husband into the house and tried to find out to whom he was talking; the maid says she heard him say, "Go ahead and buy it," and she heard Mrs. Britton ask, "Buy what?" and about that time she heard shots, but that she did not see who fired them; did not see anyone with a pistol.

The defendant in her testimony says she followed Mr. Britton into the house to learn to whom he was talking; that when she went to the door the deceased was in the telephone nook with the phone receiver and transmitter to his ear and to his mouth, and with the pistol she had bought that day in his hand; she says he turned toward her with the pistol in his hand, and she did not know whether he intended to kill her or not; that she grabbed the pistol and it was discharged, and from that

time on she did not know what transpired until she remembers being out of the house on the driveway where the deceased was lying behind his car. The maid says she did not see any blood on the defendant's arms until after she had been out in the yard where the body of the deceased was lying, but admits she did not notice her.

Considerable testimony was taken up both for the state and defendant describing the different holes in the walls of the house, the furniture, and the front door where the bullets from the pistol struck, which show at least five bullets were fired.

The testimony shows that the deceased was shot in the chin with a bullet that passed through the jugular vein coming out at the back of the neck. The doctors who testified stated this was a fatal wound.

The defendant denies, so far as she can remember, of going to the door and firing the shot at the deceased when he went off the porch, going to his car. Several witnesses testify they saw a woman come to the door entering on to the porch and fire a shot apparently toward the deceased.

The defendant's explanation of why she bought the pistol the morning before the deceased was killed in the afternoon was she bought it for protection when she met Frona Norman to talk to her about her husband, and the proof shows the deceased was the owner of a large pistol; that it was in the house, but the defendant explained that she bought the pistol because the pistol of the deceased was a large one and she could not carry it in her purse like the one she had bought.

Section 3062, O. S. 1931 (22 Okla. St. Ann. § 834), is in part as follows: "The questions of fact are to be decided by the jury."

The jury is the exclusive judge of the weight of the evidence, and if there is a clear conflict, or it is such that different inferences can properly be drawn, its determination will not be interfered with by the court unless it is clearly against the weight of the evidence or it appears to have been influenced by passion or prejudice. Choate v. State, 37 Okla. Cr. 314, 258 Pac. 360; Campbell v. State, 23 Okla. Cr. 250, 214 Pac. 738; Mayse v. State, 38 Okla. Cr. 144, 259 Pac. 277; Adeaholt v. State, 19 Okla. Cr. 122, 198 Pac. 351; Lady v. State, 18 Okla. Cr. 59, 192 Pac. 699; Mobbs v. State, 18 Okla. Cr. 77, 192 Pac. 823; Valdez v. State, 18 Okla. Cr. 204, 194 Pac. 451; Humberd v. State, 56 Okla. Cr. 23, 32 Pac. 2d 954; Coats v. State, 56 Okla. Cr. 26, 32 Pac. 2d 955; Kisselburg v. State, 56 Okla. Cr. 46, 33 Pac. 2d 236; Clemmer v. State, 56 Okla. Cr. 354, 40 Pac. 2d 37; Curlee v. State, 8 Okla. Cr. 263, 127 Pac. 266.

In this case the jury, after hearing the evidence and instructions of the court, and argument of counsel, found the defendant guilty of manslaughter in the first degree and fixed her punishment at ten years in the state penitentiary.

There is a direct conflict in the testimony of the defendant and the other witnesses. One of the questions the jury had to decide was why the defendant on the morning prior to the killing in the afternoon bought the pistol that was used in the killing. The defendant attempted to justify her action by saying she bought it for the purpose of protecting herself when she called on Frona Nor-

man, the woman it is claimed the deceased was infatuated with.

The testimony of the defendant as to what transpired immediately after the conversation over the phone, in which the maid stated she heard the deceased say, "Go ahead and buy it," and the defendant ask, "Buy what?" is to say the least unreasonable and the physical facts do not bear out the statements.

The deceased, according to defendant's testimony, when she went to the door of the telephone nook had the combination receiver and mouthpiece to his head, and the deceased was immediately shot after the defendant asked the question, "Buy what." The deceased was shot in the chin to the right, the bullet coming out the back of his neck.

The jury by its verdict did not believe the defendant's version that she got into a scuffle with the deceased and the shots were fired. It does not stand to reason that if you are in a scuffle with another person over a pistol it would be turned so the bullet discharged by the pistol would enter the chin, to the right side and come out at the back of the neck. The jury evidently believed that when the deceased said, "Go ahead and buy," and defendant asked, "Buy what," the deceased was talking to Frona Norman and that the defendant immediately fired the shot that entered the chin of the deceased cutting his jugular vein and coming out at the back of his neck. The other shots that were fired took effect in the wall and different parts of the building. The testimony is amply sufficient to sustain the finding of the jury of manslaughter in the first degree, and unless there is some error in the record shown to have been committed by the trial court in the admission of evidence, or its instructions, this court will not reverse the judgment.

We do not think the testimony sufficient to show that the defendant, from the time the trouble started until after the shooting, was temporarily insane, for the reason that every act and statement she made indicated she knew exactly what she was doing. She tried to call an ambulance, and later requested that her attorney be called. The facts stated clearly show it was not an accident.

The instructions have been carefully read and studied and when taken in their entirety correctly advise the jury as to the law applicable to the facts in the case. Some complaint was made by the defendant on the question of the court's instructions on manslaughter in the first degree. If a portion of the argument of defendant is correct, and the shots were fired in a scuffle, then it is clear it was the duty of the court to instruct the jury upon both murder and manslaughter in the first degree. When a party on trial for murder pleads self-defense, it then becomes the duty of the court to correctly advise the jury on the degrees of crime that may be an included offense in the charge of murder according to the testimony. The instructions of the court are as fair to the defendant as they are to the state, and this court feels constrained to say that there is no error in the instructions when taken in their entirety, warranting this court in reversing the case. There are other errors assigned by the defendant which have been carefully examined and the court finds they do not possess sufficient merit to warrant a reversal.

The defendant in her motion and supplemental motion for a new trial insists that the facts stated in the motion are sufficient to warrant this court in setting aside the conviction and granting her a new trial, and relies in part upon the affidavits of John Morrisey and Ezekial Spivey.

It is admitted that Morrisey was questioned prior to the trial as to what he might know about the case, and he claimed he knew nothing about it. If the defendant thought Morrisey was an important witness, there was no reason why she should not have had a subpoena issued and brought him into court where the court could have inquired of him what he knew. The testimony of Morrisey as set forth in the motion for a new trial, if true, would not have changed the fact that the fatal shot had been fired while the defendant and deceased were in their home, and would only be conflicting as to the testimony of the other witnesses who had seen a woman come out on the porch after the deceased came out of the house and fired a shot at or toward the deceased.

As to Frona Norman's testimony, the defendant knew her name and she could have been subpoenaed and if she would not volunteer to appear and testify, the defendant could have given notice to take her deposition in the city of Joplin, Mo. This witness was not unknown to the defendant, and the facts surrounding the killing after the defendant came out of the house were known by a number of witnesses who were across the street when the trouble occurred.

The motion for a new trial, on the ground of newly discovered evidence, is addressed to the sound discretion of the trial court. The presumption is that the discretion is properly exercised and the rulings of the court will not be disturbed unless an abuse of this discretion is shown. Campbell v. State, 37 Okla. Cr. 321, 258 Pac. 357; Hamilton v. State, 42 Okla. Cr. 159, 274 Pac. 1092; Campbell v. State, 42 Okla. Cr. 156, 274 Pac. 1094; McKinney v. State, 18 Okla. Cr. 562, 196 Pac. 974.

There is nothing in the record to show that the court, after hearing all the facts upon the motion and supplemental motion for a new trial, abused its discretion. The motion and supplemental motion for a new trial was properly overruled.

When a case is fairly tried and submitted to the jury by adequate instructions of the court, and the testimony is such that the jury is warranted under any reasonable conception of the facts in finding a verdict of guilty, this court will not disturb such verdict on appeal.

The defendant was accorded a fair and impartial trial. The court advised the jury correctly as to the law applicable to the defense made by the defendant and the facts in the case. There are no errors in the record prejudicial to the rights of the defendant that would warrant this court in reversing the case.

The judgment of the trial court is affirmed.

DOYLE and BAREFOOT, JJ., concur.